**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN**

|  |  |  |
|---|---|---|
| **SENATOR RON JOHNSON** | : | |
| | : | |
| **and** | : | |
| | : | |
| **BROOKE ERICSON,** | : | |
| | : | |
| **Plaintiffs,** | : | **Case No. 14-cv-00009** |
| | : | |
| **v.** | : | **Hon. William C. Griesbach** |
| | : | |
| **U.S. OFFICE OF PERSONNEL** | : | **ELECTRONICALLY FILED** |
| **MANAGEMENT,** *et al.,* | : | |
| | : | |
| **Defendants.** | : | |

**BRIEF OF *AMICI CURIAE*
MEMBERS OF THE UNITED STATES CONGRESS
AND THE JUDICIAL EDUCATION PROJECT
IN SUPPORT OF PLAINTIFFS**

Gregory G. Katsas
Anthony J. Dick
JONES DAY
51 Louisiana Ave, NW
Washington, DC 20001
(202) 879-3939
ggkatsas@jonesday.com
ajdick@jonesday.com

*Counsel for Amici Curiae*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

CIVIL LOCAL RULE 7.1 DISCLOSURE STATEMENT ........................................................ vii

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................... 1

I.     The Regulations At Issue Reflect A Growing Trend of Executive Lawlessness ........... 1

       A.  The President Must Take Care That The Law Be Faithfully Executed ...................... 4

       B.  The ACA Has Not Been Faithfully Executed ............................................................ 5

              1.  Revision And Suspension Of The Law Regulating Insurance Plans .............. 6

              2.  Suspension And Revision Of The Employer Mandate ................................... 8

              3. Revision Of The Individual Mandate ............................................................ 11

              4.  Unauthorized Expansion Of Federal Subsidies ........................................... 12

                     i.   Insurance Purchased Through Federal Exchanges ........................... 13

                     ii.  Insurance Purchased Outside Any Exchanges.................................. 14

              5.  Suspension Of The Medicaid Maintenance-Of-Effort Provision ................. 15

II.  Lawmakers and Their Official Staff Have Standing To Challenge the Illegal
     Distortion of Their Personal Health Benefits................................................................ 17

       A.  The OPM Rule Alters Plaintiffs' Health Benefits In A Manner Harmful To
            Them Personally ....................................................................................................... 18

       B.  The OPM Rule Denies Plaintiffs' Statutory Right To Equal Treatment.................... 21

       C.  The OPM Rule Forces Plaintiffs To Become Complicit In Breaking The Law ........ 23

CONCLUSION................................................................................................................... 25

CERTIFICATE OF SERVICE .................................................................................................

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Adarand Constructors, Inc. v. Pena,
515 U.S. 200 (1995)..................................................................................22

Allen v. Wright,
468 U.S. 737 (1984)..................................................................................22

Boehner v. Anderson,
30 F.3d 156 (D.C. Cir. 1994) ................................................18, 19, 23

Bolte v. Home Ins. Co.,
744 F.2d 572 (7th Cir. 1984) ................................................................20

Clinton v. City of New York,
524 U.S. 417 (1998)....................................................................................4

Coleman v. Miller,
307 U. S. 433 (1939)................................................................................17

Foster v. Center Township,
798 F.2d 237 (7th Cir. 1986) ................................................................18

Frank v. United States,
78 F.3d 815 (2d Cir. 1996), vacated on other grounds, 521 U.S. 1114 (1997).....................24

HHS v. Florida,
S. Ct. No. 11-398 (Jan. 6, 2012) ..........................................................5

INS v. Chadha,
462 U.S. 919 (1983)....................................................................................5

Joint Anti-Fascist Refugee Comm. v. McGrath,
341 U.S. 123 (1951) (plurality opinion) .............................................19

Lujan v. Defenders of Wildlife,
504 U.S. 555 (1992)..................................................................................17

Lujan v. National Wildlife Federation,
497 U.S. 871 (1990)..................................................................................23

Meese v. Keene,
481 U.S. 465 (1987)..................................................................................19

*Mississippi Univ. for Women v. Hogan*,
  458 U.S. 718 (1982)..........................................................................................22

*Northeast Florida Contractors v. City of Jacksonville*,
  508 U.S. 656 (1993)..........................................................................................22

*OPM v. Richmond*,
  496 U.S. 414 (1990)..........................................................................................14

*People Who Care v. Rockford Board of Education*,
  171 F.3d 1083 (7th Cir. 1999) ....................................................................20, 21

*Printz v. United States*,
  521 U.S. 898 (1997)..........................................................................................13

*Raines v. Byrd*,
  521 U.S. 811 (1997)..........................................................................................17

*Regents of the Univ. of California v. Bakke*,
  438 U.S. 285 (1978) (opinion of Powell, J.)....................................................22

*Sebelius v. Hobby Lobby*,
  No. 13-354 (Mar. 25, 2014), Tr. 59:15-16, 59:25-60:3 ....................................6

STATUTES

5 U.S.C. § 8906...................................................................................................2, 3

26 U.S.C. § 36B...............................................................................................13, 14

26 U.S.C. § 4980H..........................................................................................8, 9, 11

26 U.S.C. § 5000A..........................................................................................11, 12

26 U.S.C. § 6055...................................................................................................9

42 U.S.C. § 300gg-8..........................................................................................7, 8

42 U.S.C. § 1396a................................................................................................15

42 U.S.C. § 18011...........................................................................................6, 11

42 U.S.C. § 18041................................................................................................13

42 U.S.C. § 18091................................................................................................11

ACA, § 1304.........................................................................................................3

ACA, § 1311........................................................................................................13

ACA, § 1312 ............................................................................................ *passim*

ACA, § 1321 ....................................................................................................13

ACA, § 1401 ....................................................................................................13

ACA, § 1502 ......................................................................................................9

ACA, § 1513 ......................................................................................................9

ACA, § 2001 ....................................................................................................15

Congressional Accountability Act of 1995, Pub. L. No. 104-1, *codified as amended at* 2 U.S.C. § 1301 *et seq.*......................................................................................22

REGULATORY AND CONSTITUTIONAL AUTHORITIES

5 C.F.R. § 890.501 .............................................................................................3

5 C.F.R. § 890.102 ...........................................................................................25

26 C.F.R. § 1.36B-2 .........................................................................................14

45 C.F.R. § 155.20 ...........................................................................................14

45 C.F.R. § 147.140 ...........................................................................................6

78 Fed. Reg. 72,322 (Dec 2, 2013) ...................................................................7

78 Fed. Reg. 60653 (Oct. 2. 2013)..............................................................3, 23

79 Fed. Reg. 8544 (Feb. 12, 2014) ................................................................11

English Bill of Rights of 1689 ...........................................................................5

U.S. Const., Art. I, § 9, cl. 7.............................................................................14

OTHER AUTHORITIES

Jonathan Adler & Michael Cannon, "Taxation Without Representation: The Illegal IRS Rule to Expand Tax Credits Under the PPACA," 23 HEALTH MATRIX 1 (2013) ...................14

Associated Press, "Policy notifications and current status, by state," Dec. 26, 2013 ....................7

Authority for Mandate Delay Act, H.R. 2667, 113th Cong. (2013) .............................10

John Bresnahan, "Government Shutdown: John Boehner's private fight for Hill health subsidies," *Politico*, Oct. 1, 2013................................................................................2

John Bresnahan and Jake Sherman, "President Obama on Hill's Obamacare mess: I'm on it," *Politico*, July 31, 2013 ........................................................................................................3

Centers for Medicare & Medicaid Services, "CMS Bulletin to Marketplaces on Availability of Retroactive Advance Payments of the PTC and CSRs in 2014 Due to Exceptional Circumstances" ...............................................................................................15

Centers for Medicare & Medicaid Services, "Extended Transition to Affordable Care Act-Compliant Policies, Mar. 5, 2104 .......................................................................................8

Centers for Medicare & Medicaid Services, "Letter to State Insurance Commissioners", Nov. 14, 2013...........................................................................................................................7

Congressional Budget Office, "Analysis of the Administration's Announced Delay of Certain Requirements Under the Affordable Care Act," .......................................................10

IRS Notice 2013-45 ......................................................................................................................9

"Issues Raised by Foreign Relations Authorization Bill," 14 Op. O.L.C. 37 (1990) .....................4

Letter of January 7, 2013 from the Acting Administrator of HHS's Centers for Medicare & Medicaid Services to the Maine Commissioner of Health & Human Services..................15

Alex Nussbaum, Bloomberg News, "Health Policies Canceled in Latest Hurdle for Obamacare"..............................................................................................................................6

Questions and Answers on Employer Shared Responsibility Provisions Under the Affordable Care Act...............................................................................................................10

"Shared Responsibility for Employers Regarding Health Coverage," 79 Fed. Reg. 8544, 8574 (Feb. 12, 2014)..............................................................................................................11

Speech of Speaker of the House Nancy Pelosi before the National Ass'n of Counties (March 9, 2010) .....................................................................................................................16

Statement of Administration Policy, July 16, 2013 ....................................................................10

"The Attorney General's Duty to Defend and Enforce Constitutionally Objectionable Legislation," 4A Op. O.L.C. 55 (1980) ...................................................................................4

The White House, Office of the Press Secretary, "Remarks by the President in a Press Conference" ...........................................................................................................................10

U.S. Dept. of Health and Human Services, "Options Available for Consumers with Cancelled Policies," Dec. 19, 2013.........................................................................................12

U.S. Dept. of Treasury, "Continuing to Implement the ACA in a Careful, Thoughtful Manner," July 2, 2013.............................................................................................................9

U.S. Dept. of Treasury, Press Release, "Treasury and IRS Issue Final Regulations Implementing Employer Shared Responsibility Under the Affordable Care Act for 2015".................................................................................................................................10

Elise Viebeck, *The Hill*, March 3, 2014, "New O-Care delay to help midterm Dems,".................8

## CIVIL LOCAL RULE 7.1 DISCLOSURE STATEMENT

Counsel for *amici curiae* furnish the following disclosure in compliance with Civil L. R. 7.1 and Fed. R. Civ. P. 7.1. The *amici* represented here are the Judicial Education Project as well as 38 Members of the United States Congress.[1] The Judicial Education Project has no parent corporation, and no publicly held corporation owning more than 10 percent of its stock. The undersigned attorneys from the law firm of Jones Day are the only attorneys expected to appear in this Court on behalf of *amici*.

---

[1] *Amici* include the following 12 Members of the United States Senate and 26 Members of the United States House of Representatives: Sen. Richard Burr, Sen. Saxby Chambliss, Sen. Tom Coburn, Sen. Ted Cruz, Sen. Mike Enzi, Sen. Lindsey Graham, Sen. Dean Heller, Sen. Mark Kirk, Sen. John McCain, Sen. Tim Scott, Sen. John Thune, Sen. David Vitter, Rep. Mark Amodei, Rep. Andy Barr, Rep. Marsha Blackburn, Rep. Michael Burgess, Rep. Steve Chabot, Rep. Chris Collins, Rep. Tom Cotton, Rep. Steve Daines, Rep. Ron DeSantis, Rep. Jeff Duncan, Rep. Bill Flores, Rep. Phil Gingrey, Rep. Trey Gowdy, Rep. Andy Harris, Rep. David Jolly, Rep. Jim Jordan, Rep. Thomas Massie, Rep. Mark Meadows, Rep. Robert Pittenger, Rep. Bill Posey, Rep. Tom Price, Rep. Dennis Ross, Rep. Keith Rothfus, Rep. Matt Salmon, Rep. Mark Sanford, and Rep. Marlin Stutzman.

## INTRODUCTION

The unlawful executive action at issue in this case is not an isolated incident. Rather, it is part of an ongoing campaign by the Executive Branch to rewrite the Affordable Care Act ("ACA") on a wholesale basis. If left unchecked, that campaign threatens to subvert the most basic precept of our system of government: The President of the United States is constitutionally obligated to take care that the law be faithfully executed; he does not have the power to modify or ignore laws that have been duly enacted by Congress and that he believes are constitutional.

In pursuing its strategy of unilateral governance, the Executive Branch has aggressively sought to frustrate judicial review of its actions. But courts must not shrink from their duty to enforce limits on executive power when necessary to protect the rights of individuals in actual cases and controversies. This case is a prime example. Although the Plaintiffs here are a Member of Congress and a congressional staffer, they do not rely on any abstract theory of legislative or institutional standing. Instead, they seek redress because the challenged regulations alter their personal health benefits in manner harmful to them, deny their statutory right to equal treatment under the law, and force them to become complicit in illegal activity. Given these concrete personal harms, Plaintiffs' standing must be affirmed to vindicate a simple principle: When private citizens enter public service, they do not forfeit their right to seek redress in court for personal injuries suffered at the hands of the Executive Branch.

## ARGUMENT

## I.     The Regulations At Issue Reflect A Growing Trend of Executive Lawlessness

The regulations at issue in this case illustrate the increasing lawlessness of the Executive Branch's implementation of the ACA. As Plaintiffs explain in their complaint, the regulations conflict with various provisions of the ACA and the Federal Employee Health Benefits Program ("FEHBP"). Thus, although this case presents the purely legal question whether the regulations

are consistent with these statutes, the Government, in its motion to dismiss, does not even attempt a defense on the merits.

The Government's reluctance to defend its own regulations is understandable. By its terms, Section 1312(d)(3)(D) of the ACA provides that "the only health plans that the Federal Government may make available" to Members of Congress and staff members employed by their official offices are plans "created under" the ACA or "offered through an Exchange established under" the ACA. As a result, Members and covered staff may no longer receive health benefits through plans provided under Chapter 89 of Title 5, which authorizes the Office of Personnel Management ("OPM") to contract with insurance companies to provide benefits to other federal employees. Those plans, supervised by OPM and provided through the FEHBP, are neither "created under" the ACA nor "offered through an Exchange established under" the ACA. As Plaintiffs explain, the obvious purpose of Section 1312(d)(3)(D) was to require Members of Congress and covered staff to live under the same rules as do the millions of Americans forced by the ACA to obtain health insurance through the exchanges. Thus, Members and covered staff no longer qualify for the generous government subsidies for plans provided through the FEHBP, which are available only for federal employees "enrolled in a health benefits plan under this chapter [*i.e.*, Chapter 89 of Title 5]." *See* 5 U.S.C. 8906(b).

Consistent with the clear command to shift Members of Congress and covered staff from the FEHBP to the ACA exchanges, OPM "initially ruled that lawmakers and staffers couldn't receive the [FEHBP] subsidies once they went into the exchanges."[2] Apparently disapproving of

---

[2] John Bresnahan, "Government Shutdown: John Boehner's private fight for Hill health subsidies," *Politico*, Oct. 1, 2013, *available at* http://www.politico.com/story/2013/10/john-boehner-hill-obamacare-subsidies-97634.html.

that result, the President then chose to become "personally involved" in the OPM matter.[3]  But instead of asking Congress to amend the law, he apparently decided to rewrite it unilaterally.  Following his decision to become "personally involved," OPM changed its position and promulgated a regulation providing that Members of Congress and covered staff, if they obtain health insurance through the Small Business Health Options Program ("SHOP"), an exchange run by the government of the District of Columbia, *will* continue to be eligible for generous *FEHBP* subsidies.  *See* 5 C.F.R. § 890.501; 78 Fed. Reg. 60653, 60653-54 (Oct. 2. 2013).

To reach that remarkable result, OPM had to pretend, among other things, that the United States Government (or, only slightly less absurdly, the United States Congress) is a "small employer" of not more than 100 employees.  *See* ACA § 1312(a)(2)(A) (only "qualified employer" may provide health benefits to employees through SHOP exchange); *id.* § 1312(f)(2)(A) ("qualified employer" must be "small employer"); *id.* § 1304(b)(2) (defining "small employer" as having "not more than 100 employees").  Moreover, OPM had to further pretend that the D.C. SHOP exchange is a "health benefits plan under" Chapter 89 of Title 5, *see* 5 U.S.C. § 8906(b), rather than an "Exchange established under" the ACA, *see* ACA § 1312(d)(3)(B).  *See also* 5 U.S.C. § 8906(a) (limiting FEHBP subsidies to "enrollments under this chapter [*i.e.,* Chapter 89 of Title 5]."  And OPM had to eviscerate the manifest purpose of Section 1312(d)(3)(D)—to ensure, at least in the context of health insurance, that those who make the law must also live under it.

All of this would be bad enough if it were an isolated instance of executive overreach.  Unfortunately, however, similar problems afflict the ACA in its entirety, as the Executive Branch

---

[3]  John Bresnahan and Jake Sherman, "President Obama on Hill's Obamacare mess: I'm on it," *Politico*, July 31, 2013 *available at* http://www.politico.com/story/2013/07/obama-hill-health-care-dispute-95017.html.

is engaged in an ongoing campaign to unilaterally rewrite virtually every major portion of that landmark statute. This broader campaign—and the Executive's consistent attempts to frustrate any judicial review of it—should inform how the Court considers the standing and merits questions presented in this case.

## A.    The President Must Take Care That The Law Be Faithfully Executed

The United States Constitution provides for a government of laws, not men. Far from being above the law, the President is affirmatively required to obey and enforce it. Article II, Section 3 of the Constitution provides that the President "shall take care that the Laws be faithfully executed." This duty is mandatory, not optional. As the Supreme Court has explained, "[t]here is no provision in the Constitution that authorizes the president to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Rather, he must faithfully execute the law that Congress enacts.

Under presidents of both political parties, the Executive Branch itself has long recognized that "[t]he President has no 'dispensing power,'" and thus "may not lawfully defy an Act of Congress if the Act is constitutional."[4] Although some presidents have asserted the right to decline to enforce laws that they believe are unconstitutional, the sitting President believes the ACA to be constitutional, and no president has ever before claimed the authority to "refuse to enforce a statute he opposes for policy reasons."[5] "In those rare instances in which the Executive may lawfully act in contravention of a statute, it is the Constitution that dispenses with the operation of the statute. The Executive cannot."[6]

---

[4] "The Attorney General's Duty to Defend and Enforce Constitutionally Objectionable Legislation," 4A Op. O.L.C. 55, 59-60 (1980).

[5] "Issues Raised by Foreign Relations Authorization Bill," 14 Op. O.L.C. 37, 51 (1990).

[6] 4A Op. OLC at 59-60.

This principle has deep roots in our constitutional history, as it incorporates hard lessons from the abuse of royal power under the old British Monarchy. In the wake of the Glorious Revolution, the English Bill of Rights of 1689 declared that "the pretended power of suspending of laws, or the execution of laws, by regal authority, without consent of parliament, is illegal." The Take Care Clause of our Constitution is a direct descendent of that provision.

Recently, however, the President has asserted a seemingly unbounded dispensing power to modify troublesome provisions of the ACA. In some instances, he has unilaterally suspended major provisions of it in order to alleviate the onerous burdens that the law imposes on individuals, employers, insurance companies, and states. In other cases like this one, his Executive Branch has not merely suspended but actively *amended* the law, by creating novel regulatory programs and doling out large subsidies from the Treasury with little pretext of statutory authority, in the apparent hope that no party will have standing to challenge these actions. *Amici* share the President's apparent concerns with the ACA as enacted. But any suspension or modification of the Act must come from a statute bicamerally enacted by Congress and signed by the President; it cannot come from the unilateral action of either House or of the President. *See INS v. Chadha*, 462 U.S. 919, 944-59 (1983).

B.     **The ACA Has Not Been Faithfully Executed**

Instead of faithfully implementing and executing the ACA, the Executive Branch has claimed open-ended authority to suspend or modify that law. The result has been a wholesale rewrite of the ACA by executive fiat. According to the Administration itself, the ACA has five major pillars: a set of substantive insurance regulations, an employer mandate, an individual mandate, the use of subsidies to encourage the purchase of health insurance through state-run exchanges, and an expansion of state obligations under Medicaid. See Gov't Br. at 9-12, *HHS v.*

*Florida*, S. Ct. No. 11-398 (Jan. 6, 2012). But through its own unilateral action, the Executive has knocked down each of the pillars.

### 1. Revision And Suspension Of The Law Regulating Insurance Plans

The ACA imposes a host of onerous new requirements on insurance plans sold on or after January 1, 2014. The statute also contains a grandfathering provision, which provides that "[n]othing in this Act (or an amendment made by this Act) shall be construed to require that an individual terminate coverage under a group health plan or health insurance coverage in which such individual was enrolled on March 23, 2010." 42 U.S.C. § 18011(a)(1). This provision formed the basis for the President's now-infamous promise to voters that "if you like your healthcare plan, you can keep it." But despite that promise, the reality has been quite different.

In its initial implementation of the ACA, the Executive Branch eviscerated the grandfathering protection by promulgating regulations eliminating grandfathered status whenever insurance plans make even the most minor adjustments over time (which all of them must inevitably do). *See* 45 C.F.R. § 147.140(g). As the Solicitor General recently told the Supreme Court, the number of people protected by the grandfathering provision will be "very, very low," because "it's to be expected that employers and insurance companies are going to make decisions that trigger the loss of that so-called grandfathered status under the governing regulation." *Sebelius v. Hobby Lobby*, No. 13-354 (Mar. 25, 2014), Tr. 59:15-16, 59:25-60:3. Consequently, with the grandfathering provision gutted by regulation, insurance companies began sending out hundreds of thousands of cancellation notices as the 2014 effective date of the ACA approached.[7] According to some estimates, the number of people who will lose their existing insurance coverage because of the ACA reaches into the millions.[8]

---

[7] *See, e.g.,* Alex Nussbaum, Bloomberg News, "Health Policies Canceled in Latest

In response to the ensuing political outcry, the President announced that he would act to fix the problem—not by repealing the Executive's own regulations gutting the grandfathering provision, and not by seeking to amend the ACA through Congress, but by unilaterally suspending the statutory provisions that apply to non-grandfathered plans. On November 14, 2013, the Department of Health and Human Services ("HHS") announced in a letter that insurance companies would be allowed to sell policies that, by HHS's own admission, violate the plain terms of the law.[9] The letter began by cataloguing eight separate statutory requirements for non-grandfathered plans, which it described as follows:

- Section 2701 (relating to fair health insurance premiums);
- Section 2702 (relating to guaranteed availability of coverage);
- Section 2703 (relating to guaranteed renewability of coverage);
- Section 2704 (relating to the prohibition of pre-existing condition exclusions or other discrimination based on health status), with respect to adults, except with respect to group coverage;
- Section 2705 (relating to the prohibition of discrimination against individual participants and beneficiaries based on health status), except with respect to group coverage;
- Section 2706 (relating to non-discrimination in health care);
- Section 2707 (relating to comprehensive health insurance coverage);
- Section 2709, as codified at 42 U.S.C. § 300gg-8 (relating to coverage for individuals participating in approved clinical trials).

*Id.* at 2. The letter also acknowledged that, under the ACA, all of these requirements were "scheduled to take effect" on January 1, 2014. *Id.* Nonetheless, the letter stated that health plans violating these requirements "will not be considered to be out of compliance" if the coverage

(continued…)

Hurdle for Obamacare," *available at* http://www.bloomberg.com/news/2013-10-29/health-policies-canceled-in-latest-hurdle-for-obamacare.html.

[8] *See* Associated Press, "Policy notifications and current status, by state," Dec. 26, 2013, *available at* http://news.yahoo.com/policy-notifications-current-status-state-204701399.html.

[9] *See* Centers for Medicare & Medicaid Services, "Letter to State Insurance Commissioners", Nov. 14, 2013, *available at* http://www.cms.gov/CCIIO/Resources/Letters/Downloads/commissioner-letter-11-14-2013.PDF. The suspension was later published in the federal register as a proposed rule. *See* 78 Fed. Reg. 72,322 (Dec 2, 2013).

was previously in effect and if the carrier provides certain notifications. *Id.* at 1-2. In other words, according to the Executive's unilateral decree, and contrary to the plain terms of the statute, "health insurance issuers may choose to continue coverage that would otherwise be terminated or cancelled, and affected individuals and small businesses may choose to re-enroll in such coverage." *Id.* The letter characterized its ruling not as a new administrative interpretation of the grandfathering provision, but as "transitional relief" from the various other statutory provisions cited in the letter. *See id.* at 1 n.2.

Originally, the period during which non-compliant policies could be sold ran from January 1, 2014, to October 1, 2014. But after many observers noted that this timeframe would result in a new wave of policy cancellations shortly before the midterm congressional elections, HHS soon announced a further suspension of the law for another two years.[10] Under the new announcement, insurance companies may continue to sell illegal coverage—which the Executive euphemistically refers to as "coverage that would otherwise be cancelled"—until October 2016.[11] There is no statutory authority for this unilateral suspension of eight major provisions of the ACA for almost three years.

### 2. Suspension And Revision Of The Employer Mandate

The ACA requires private employers with more than 50 full-time employees to offer health coverage that meets various requirements. 26 U.S.C. § 4980H(c)(2)(A). For employers who fail to offer such coverage, the statute imposes annual penalties of thousands of dollars per affected employee. *Id.* § 4980H(a). The statute also imposes penalties on employers who do

---

[10] *See* Elise Viebeck, The Hill, March 3, 2014, "New O-Care delay to help midterm Dems," *available at* http://thehill.com/blogs/healthwatch/health-reform-implementation/199784-new-obamacare-delay-to-help-midterm-dems.

[11] *See* Centers for Medicare & Medicaid Services, "Extended Transition to Affordable Care Act-Compliant Policies, Mar. 5, 2104, *available at* http://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/transition-to-compliant-policies-03-06-2015.pdf.

offer coverage, but whose employees nonetheless obtain subsidized insurance through an exchange. *Id.* § 4980H(b). In conjunction with these coverage provisions, the statute also imposes reporting requirements on employers. *Id.* § 6055. For all of these provisions, the ACA plainly sets forth an effective date of January 1, 2014. *See* ACA § 1502(e) ("The amendments made by this section shall apply to calendar years beginning after 2013."); *id.* § 1513(d) ("The amendments made by this section shall apply to months beginning after December 31, 2013."). But by fiat, the Executive has now suspended these laws by twice postponing their effective date. Even worse, the second of the suspension orders purports to modify substantive law as well as effective dates, and to create regulatory categories with no statutory basis whatsoever.

On the Friday before the July 4th holiday weekend in 2013, the Treasury Department decreed in a blog post that the employer mandate—and its associated penalties and reporting requirements—"will not apply for 2014."[12] Under the ironic headline "Continuing to Implement the ACA in a Careful, Thoughtful Manner," the post attempted to explain why the Administration would *not* implement the employer mandate for one year. The post did not claim that the mandate or its effective date were unconstitutional, but instead gave only policy reasons for the suspension: to allow the government "to consider ways to simplify the new reporting requirements" and to "provide time" for employers "to adapt health coverage and reporting systems" as required by the ACA. But whatever the merits of those policy justifications, Congress did not leave the matter up to executive discretion. Instead, it expressly declared that

---

[12] *See* U.S. Dept. of Treasury, "Continuing to Implement the ACA in a Careful, Thoughtful Manner," July 2, 2013, *available at* http://www.treasury.gov/connect/blog/pages/continuing-to-implement-the-aca-in-a-careful-thoughtful-manner-.aspx. The Administration subsequently issued official guidance in IRS Notice 2013-45, *available at* http://www.irs.gov/pub/irs-drop/n-13-45.PDF.

the law would go into effect on January 1, 2014.  That date is hardly insignificant, as the employer mandate is projected to produce some $10 billion in annual revenue.[13]

Following this initial announcement, the House of Representatives passed a bill that would have established a sound legal basis for this executive action, by delaying the effective date of the employer mandate from January 1, 2014, to January 1, 2015.[14]  But rather than welcoming this development, the President formally threatened a veto.[15]  When asked about the issue in a press conference, the President said that while he would normally "prefer" to seek a "change to the law" from Congress, he had chosen to act unilaterally in this instance because of the "political environment . . . when it comes to Obamacare."[16]

The Administration's refusal to enforce the employer mandate did not end with this initial one-year suspension.  On February 10, 2014, the Department of the Treasury issued final rules unilaterally revising the mandate once again.  According to those regulations, employers with between 50 and 99 full-time employees will be exempt from all aspects of the employee-coverage requirements until 2016.[17]  They will lose that exemption, however, if they do not

---

[13]  *See* Congressional Budget Office, "Analysis of the Administration's Announced Delay of Certain Requirements Under the Affordable Care Act," *available at* http://www.cbo.gov/publication/44465.

[14]  *See* Authority for Mandate Delay Act, H.R. 2667, 113th Cong. (2013).

[15]  *See* Statement of Administration Policy, July 16, 2013, *available at* http://www.whitehouse.gov/sites/default/files/omb/legislative/sap/113/saphr2667r_20130716.pdf.

[16]  *See* The White House, Office of the Press Secretary, "Remarks by the President in a Press Conference," *available at* http://www.whitehouse.gov/the-press-office/2013/08/09/remarks-president-press-conference.

[17]  *See* U.S. Dept. of Treasury, Press Release, "Treasury and IRS Issue Final Regulations Implementing Employer Shared Responsibility Under the Affordable Care Act for 2015," *available at* http://www.treasury.gov/press-center/press-releases/Pages/jl2290.aspx; *see also* Questions and Answers on Employer Shared Responsibility Provisions Under the Affordable Care Act, *available at* http://www.irs.gov/uac/Newsroom/Questions-and-Answers-on-Employer-Shared-Responsibility-Provisions-Under-the-Affordable-Care-Act #Transition.

comply with a new "maintenance of workforce" regulation, which bars them "reduc[ing] the size of [their] workforce or the overall hours of service of [their] employees" unless they have a "bona fide business reason[]."[18]  For employers with over 100 employees, the requirements will begin at the start of 2015, but will require an offer of compliant coverage to only 70 percent of employees in 2015, and 95 percent in 2016 and beyond.[19]  None of this is remotely consistent with the ACA, which by its terms requires *all* employers with more than *50* full-time employees to pay stiff penalties if they do not offer compliant health insurance to *all* full-time employees beginning in *2014*.  26 U.S.C. § 4980H(a).

### 3.     Revision Of The Individual Mandate

The ACA's individual mandate requires individuals to maintain a specified minimum level of health insurance.  26 U.S.C. § 5000A.  In the ACA, Congress found that the individual mandate was "essential to creating effective health insurance markets" because, without it, healthy individuals would simply "wait to purchase health insurance until they needed care."  42 U.S.C. § 18091(a)(2)(I).  But in response to a persistent political backlash, the Administration has dramatically curtailed the scope of the individual mandate by transforming its narrow hardship exemption into a blanket waiver for millions of people.

The ACA specifies a list of exemptions from both the individual mandate and its associated penalty for noncompliance.  26 U.S.C. § 5000A(d), (e).  There is a specific exemption for individuals for whom the cost of coverage would exceed 8 percent of their household income.  *Id.* § 5000A(e)(1)(A).  The statute also provides a residual "hardship" exemption for any individual determined by HHS "to have suffered a hardship with respect to the capability to

---

[18]  *See* "Shared Responsibility for Employers Regarding Health Coverage," 79 Fed. Reg. 8544, 8574 (Feb. 12, 2014).

[19]  *Id.* at 8575.

obtain coverage." *Id.* § 5000A(e)(5). By specifically setting the threshold of affordable coverage at 8 percent of household income, Congress made clear that the general "hardship" exemption could not be expanded to encompass the ordinary situation where an individual can afford qualifying coverage for less than that amount.

Nonetheless, the Administration recently announced that the millions of individuals who had lost insurance coverage due to the ACA would be excused from the requirement to obtain replacement coverage, thus treating the intended operation of the ACA itself as a "hardship." To achieve this result, HHS expanded the general hardship exemption to encompass anyone who "complete[s] a hardship exemption form, and indicate[s] that [their] current health insurance policy is being cancelled and [*they*] *consider* other available policies unaffordable."[20] The scope of this expanded hardship exemption is vastly broader than what the ACA allows. Whereas the statute defines financial hardship by reference to an *objective* benchmark of 8 percent of household income, HHS has now expanded it to cover millions of individuals based on their own entirely *subjective* and open-ended determination that they "consider" available insurance to be "unaffordable." In effect, the Administration has exempted from the individual mandate *anyone* who lost insurance thanks to the ACA. If Congress's finding about the "essential" nature of the individual mandate were credited, this unilateral executive action would cut at the heart of the overall legislative scheme.

### 4. Unauthorized Expansion Of Federal Subsidies

The ACA provides significant subsidies for insurance purchased through health exchanges established by a *state*. Nonetheless, the Executive has unilaterally made these

---

[20] U.S. Dept. of Health and Human Services, "Options Available for Consumers with Cancelled Policies," Dec. 19, 2013, *available at* http://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/cancellation-consumer-options-12-19-2013.pdf (emphasis added).

subsidies available for insurance purchased through exchanges established by the *federal* government, and even for insurance purchased outside of *any* exchange.

### i.      Insurance Purchased Through Federal Exchanges

The ACA permits states to establish their own health-insurance exchanges, but also requires HHS to establish such exchanges in states that choose not to do so.  Under the law, "Each State shall, not later than January 1, 2014, establish an American Health Benefit Exchange (referred to in this title as an 'Exchange') for the State." ACA § 1311(d).  Despite that mandatory language, the Tenth Amendment prohibits the federal government from *forcing* the states to create exchanges. *See Printz v. United States*, 521 U.S. 898, 935 (1997).  Accordingly, the ACA recognizes that states may choose not to establish an exchange, ACA § 1321(b)-(c), and provides that, if a state does not do so by January 1, 2014, then HHS "shall . . . establish and operate such Exchange within the State," *id*. § 1321(c)(1).  In sum, the ACA provides for two kinds of exchanges: those established by states under section 1311 of the Act, and those established by HHS under section 1321.

As an incentive for states to establish their own exchanges, the ACA provides that a state's citizens may receive subsidies for insurance purchased through an exchange "established by the State under section 1311 of the [ACA]."  26 U.S.C. § 36B(c)(2)(A)(i); *see* ACA § 1401(a).  Nonetheless, the Internal Revenue Service ("IRS") has now unilaterally made subsidies available not only for insurance purchased on an exchange "established by the *State* under section *1311*" (emphases added), but also for insurance purchased on an exchange established by the *federal* government under section *1321*.  Under the governing regulation, subsidies are available for the purchase of insurance on *any* exchange "regardless of whether the

Exchange is established and operated by a State … *or by HHS*." 26 C.F.R. § 1.36B-2; 45 C.F.R. § 155.20 (emphasis added).

Because 36 states have declined to create exchanges, the impact of this regulation is dramatic. Altogether, "CBO projections through 2023 suggest the IRS rule is thus likely to result in more than $600 billion of unauthorized spending, $178 billion of unauthorized tax reduction, more than $100 billion in unauthorized taxes, and to increase federal deficits by some $700 billion."[21] This violates not only the plain terms of the ACA, but also the Appropriations Clause of the Constitution, which provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law" (Art. I, § 9, cl. 7). The Clause requires explicit statutory authority for any payment from the Treasury. Just as it prohibits payments made pursuant to judicially-created equitable doctrines, *see OPM v. Richmond*, 496 U.S. 414, 424-34 (1990), so too does it prohibit payments made pursuant to executive freelancing.

### ii. Insurance Purchased Outside Any Exchanges

Unsatisfied with providing illegal subsidies for insurance purchased on federal exchanges, the Executive then decided to provide illegal subsidies for certain insurance purchased outside of *any* exchange, state or federal.

Under the ACA, the amount of the authorized subsidy is calculated on a monthly basis, for each month in which the taxpayer is enrolled in a plan "through an Exchange established by the State under section 1311." 26 U.S.C. § 36B(b)(2)(A). Nonetheless, HHS recently issued a "Bulletin" making subsidies retroactively available, once an individual purchases insurance

---

[21] Jonathan Adler & Michael Cannon, "Taxation Without Representation: The Illegal IRS Rule to Expand Tax Credits Under the PPACA," 23 HEALTH MATRIX 1, 119, 137–38 (2013) (citing Letter from Douglas W. Elmendorf, Dir., Congressional Budget Office, to John Boehner, Speaker of the House 6 (July 24, 2012), *available at* http://www.cbo.gov/sites/default/files/cbofiles/attachments/43471-hr6079.pdf).

through an exchange, for prior months in which the individual had purchased insurance outside of any exchange.[22]  According to the bulletin, this further extension of subsidies was justified by the disastrous rollout of the exchanges, euphemistically described as an "exceptional circumstance" caused by "technical issues in establishing automated eligibility and enrollment functionality."[23]  But however reasonable that may be as a policy matter, it plainly contradicts the statutory text, which (1) limits subsidies to insurance purchased through exchanges and (2) requires the subsidy to be separately determined on a monthly basis, not retroactively awarded for months in which the individual had no qualifying insurance.

### 5.  Suspension Of The Medicaid Maintenance-Of-Effort Provision

Under a so-called "maintenance of effort" provision, the ACA prohibits states receiving federal Medicaid funds from restricting eligibility standards until "the date on which the Secretary [of HHS] determines that an Exchange established by the *State* under section *1311* of the [ACA] is fully operational."  42 U.S.C. § 1396a(gg)(1) (emphases added); *see* ACA § 2001(b)(2).  This provision reinforces incentives for states to establish their own exchanges.  Nonetheless, HHS has unilaterally decreed that the maintenance-of-effort provision expired for *all* states on January 1, 2014, regardless of whether the state itself had established an exchange.[24]  As with the first unlawful expansion of subsidies discussed above, HHS's indefensible rationale

---

[22]  *See* Centers for Medicare & Medicaid Services, "CMS Bulletin to Marketplaces on Availability of Retroactive Advance Payments of the PTC and CSRs in 2014 Due to Exceptional Circumstances," *available at* http://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/retroactive-advance-payments-ptc-csrs-02-27-14.pdf.

[23]  *Id.* at 1.

[24]  *See* Letter of January 7, 2013 from the Acting Administrator of HHS's Centers for Medicare & Medicaid Services to the Maine Commissioner of Health & Human Services, *available at* http://www.maine.gov/dhhs/Maine-SPA-Disapproval-12-010.pdf.

is that an exchange established by the *federal* government under section *1321* is somehow an exchange established by a "State" under section "1311."

\* \* \* \*

When the Affordable Care Act was under consideration, the then-Speaker of the House famously argued that "we have to pass the bill to find out what's in it."[25]  Now that we have read the fine print, millions of Americans are upset: employers and individuals are subject to costly and unwanted insurance mandates; millions have lost insurance because their prior policies did not comply with these mandates; a majority of states want nothing to do with running exchanges or with the coerced expansion of Medicaid; and, as this case illustrates, at least some Members of Congress do after all want to pay less for their health care than ordinary citizens.  So, it is perhaps understandable that the Administration has sought to suspend or water down the Act at every turn.  In our constitutional system, however, the remedy to address onerous and unpopular laws is through their repeal or modification by Congress, not through the President turning those laws on-and-off according to executive whim, and dispensing exemptions from those laws as he alone deems best.

Against this backdrop, the need for judicial review of the ongoing implementation of the ACA is urgent.  Of course, the courts cannot properly create Article III jurisdiction where none exists.  But where, as here, the Executive claims that the Judicial Branch is powerless to determine the lawfulness of its implementation of the ACA, the courts at a minimum should examine the claim with a healthy degree of skepticism.

---

[25]  Speech of Speaker of the House Nancy Pelosi before the National Ass'n of Counties (March 9, 2010).

## II.     Lawmakers and Their Official Staff Have Standing To Challenge the Illegal Distortion of Their Personal Health Benefits

The OPM Rule imposes legally cognizable injuries on Plaintiffs by altering their health benefits in a manner harmful to them personally, by depriving them of their statutory right to equal treatment under the law, and by forcing them to become complicit in illegal activity.

The Government places great weight on the principle that "Members of Congress may not sue to vindicate their views of legislative powers," Def. Br. at 12, but that principle is wholly inapposite here. Because the OPM Rule inflicts concrete *personal* harms on Plaintiffs, they satisfy the ordinary test for Article III standing without regard to any question of legislative standing. The purpose of legislative standing is to *enhance* lawmakers' capacity to sue, by allowing suits to "maintain[] the effectiveness of their votes" even in the absence of any personal injury. *Coleman v. Miller*, 307 U. S. 433, 438 (1939). The Supreme Court has limited that doctrine to circumstances where lawmakers can show that "their votes have been completely nullified." *Raines v. Byrd*, 521 U.S. 811, 823 (1997). But while *Raines* narrowed the special privilege of legislative standing, it did not remotely suggest that lawmakers should be *disadvantaged* when they assert standing based on *personal* injuries. When lawmakers take office, they do not somehow surrender their ordinary right to sue under Article III. And here, Plaintiffs readily satisfy ordinary Article III standards.

To satisfy the requirement of Article III standing, a plaintiff must demonstrate a "concrete and particularized" injury that is "actual or imminent," fairly traceable to the challenged action of the defendant, and redressable by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). As explained below, Plaintiffs have suffered several injuries that satisfy these standards.

## A.  The OPM Rule Alters Plaintiffs' Health Benefits In A Manner Harmful To Them Personally

The Government does not dispute that employees have standing to challenge actions that alter their health benefits in a manner that harms them personally.  Nor does the Government contest the obvious fact that the OPM regulations alter Plaintiffs' personal health benefits. Instead, the Government contends that the regulations do not "harm [Plaintiffs] in a material way," because they do not "*diminish*[] their health-coverage benefits."  Def. Br. at 12.

This argument fails to recognize that the conferral of special privileges can impose concrete harm on the intended "beneficiaries."  This is especially true for elected officials, who value their political credibility and their public reputations far more highly than any form of monetary compensation.  Accordingly, when the government confers "benefits" on Members of Congress that are inconsistent with their publicly stated (and sincerely held) policy positions, such benefits will often do them more harm than good.  Under these circumstances, Members of Congress are readily distinguishable from the food-stamp recipients in *Foster v. Center Township*, 798 F.2d 237, 242-43 (7th Cir. 1986), because they have a concrete professional and personal interest in *avoiding* the putative entitlements.

*Boehner v. Anderson*, 30 F.3d 156 (D.C. Cir. 1994), proves the point.  In that case, Congressman (now Speaker) Boehner filed a constitutional challenge to a law that *increased* his salary through an automatic cost-of-living adjustment.  He argued that this violated the Twenty-Seventh Amendment, which provides that no law increasing congressional pay may take effect before an intervening election. The government sought dismissal for lack of standing on two grounds: first, that Boehner asserted only a "generalized grievance about the conduct of government"; and second, that even though the law altered Boehner's personal salary, "an *increase* in pay is not an injury."  *Id.* at 160 (emphasis added).  The D.C. Circuit disagreed:

> Mr. Boehner is not only a Member of Congress; by virtue of that office he is also an
> employee of the United States Government. As such, he clearly has standing to challenge
> the operation of a law that directly determines his rate of pay. His claim that his pay for
> 1993 was unconstitutionally *increased* . . . alleges a 'distinct and palpable injury' to him
> in his capacity as an employee.

*Id.* (emphasis added). As for the specific contention that "an *increase* in pay is not an injury,"
the Court agreed with Boehner that "in the context of his constituency it is." *Id.* As the Court
explained, it is not "the office of a court to insist that getting additional monetary compensation
is a good when the recipient, a congressman, says that in his political position it is a bad." *Id.*

The Government argues that this theory of standing relies on "bald speculation" about the
future political effects of the OPM Rule. Def. Br. at 14. But Plaintiffs contend that the creation
of illegal privileges for them by the OPM Rule inflicts immediate damage on their political
reputation, in part by constricting the policy arguments that they can credibly make and in part
by limiting how they can credibly present themselves to their constituents. In this way, the OPM
Rule changes the political environment in which Plaintiffs are currently forced to operate, thus
subjecting them to a tangible type of harm in the here and now, not at some unknown point in the
future. In the same way that Article III does not require a defamation plaintiff to show exactly
how third parties will react to an inherently damaging *accusation*, neither does it require political
officeholders to show exactly how their constituents will react to the inherently damaging *fact* of
their receiving illegal privileges unavailable to the citizens at large. *Cf. Meese v. Keene*, 481
U.S. 465, 473 (1987) (plaintiff had standing to challenge a law under which he alleged that his
"personal, political, and professional reputation would suffer and his ability to obtain re-election
and to practice his profession would be impaired"); *Joint Anti-Fascist Refugee Comm. v.
McGrath*, 341 U.S. 123, 139 (1951) (plurality opinion) (organizations had standing to challenge
their designation as "Communist," which would "cripple the functioning and damage the

reputation of those organizations"); *Bolte v. Home Ins. Co.*, 744 F.2d 572 (7th Cir. 1984) (noting that "the stigma of being accused by a federal judge of 'reprehensible' conduct" may be "injury enough to satisfy the standing requirement in Article III of the Constitution, by analogy to the injury on which the tort of defamation is based").

The government relies extensively on *People Who Care v. Rockford Board of Education*, 171 F.3d 1083 (7th Cir. 1999), but that case addressed a claim of institutional rather than personal injury. There, the Seventh Circuit held that individual school-board members lacked standing to challenge a court order requiring the board to fund certain desegregation orders. The court emphasized that the order applied only to the board as an institution; it did not affect the individual board members' personal rights "as distinct from their official powers." *Id*. at 1090. Here, by contrast, Plaintiffs do not base their injury on the desired exercise of their "official powers" in enacting legislation, but on the unlawful alteration of the health benefits available to them personally. That is why this is not a legislative-standing case: the alleged injury is personal. The Plaintiffs contend that they are legally entitled to a certain type of health benefits, but the Government insists on giving them another.

The Government notes that one of the school-board members in *People Who Care* unsuccessfully argued that the legislative votes required by the court order would injure him "in his individual capacity by turning him into another dissembling politician in the minds of his constituents." *Id.* at 1089. But while the Seventh Circuit rejected that argument, it did *not* rely on the sweeping ground that such reputational harm can *never* give rise to an Article III injury. Rather, the Court found no cognizable injury because the alleged reputational harm was entirely derivative of the *official* action that the *board* was required to take. The Court explained that the order at issue "ran in the first instance against the school board," which made the board the

proper party to challenge the order. *See id.* at 1090. At the same time, however, the Court made clear that, even in the context of compelled official action, the individual school-board members "would be the proper appellants" had the order named only them. *Id.*

Here, of course, the situation is entirely different. Plaintiffs are not seeking to challenge an order directing the *Congress* to take some official action (which would be analogous to *People Who Care*), or even an order directing only *themselves* to take some official action (in which case *People Who Care* would support standing rather than undermine it). Nor are Plaintiffs asserting reputational interests entirely derivative of the rights of Congress as an institution. To the contrary, Plaintiffs are seeking to vindicate their own *personal* rights with regard to an aspect of their individual compensation, and the Government's only objection is that, in its view, Plaintiffs would be better off with the benefits package that the Government would force upon them than with the benefits package that Plaintiffs themselves desire. In these circumstances, the governing precedent is *Boehner*, not *People Who Care*.

### B. The OPM Rule Denies Plaintiffs' Statutory Right To Equal Treatment

Plaintiffs also have standing because the OPM Rule deprives them of a personal, statutory right to equal treatment under the law. As explained above, Section 1312(d)(3)(D) provides that "the only health plans that the Federal Government may make available" to Members of Congress and covered staff are ACA plans (which are available to the public generally) as opposed to FEHBP plans (which are available only to employees of the federal government). Section 1312(d)(3)(D) thus establishes, with respect to government-provided or government-subsidized health insurance, an anti-discrimination principle as between Members of Congress (and covered staff) and the citizenry. This rule benefits both the citizenry (by increasing lawmakers' incentives to make the exchanges work as well as possible) and the

Members (by giving them the enhanced political credibility that comes with subjecting themselves to the laws that govern the rest of us, *see generally* Congressional Accountability Act of 1995, Pub. L. No. 104-1, codified as amended at 2 U.S.C. § 1301 *et seq.*). By extending FEHBP subsidies to ACA plans for Members of Congress and their covered staff, but for no other citizens, the OPM Rule resurrects the very discrimination that Section 1312(d)(3)(D) had sought to prohibit. The OPM Rule thus deprives Members and covered staff of their statutory right to equal treatment.

It is no answer to contend that Members and covered staff supposedly benefit from the discrimination. In many contexts, the Supreme Court has recognized that discrimination often stigmatizes—and thus seriously harms—the class formally benefitted. *See, e.g.*, *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 729 (1982) (university's "policy of excluding males from admission to the School of Nursing tends to perpetuate the stereotyped view of nursing as an exclusively woman's job"); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 229 (1995) (racial preference "inevitably is perceived by many as resting on an assumption that those who are granted this special preference are less qualified") (internal quotation omitted); *Regents of the Univ. of California v. Bakke*, 438 U.S. 285, 298 (1978) (opinion of Powell, J.) ("preferential programs may only reinforce common stereotypes holding that certain groups are unable to achieve success without special protection"). As a general matter, that kind of stigmatic injury is more than sufficient to support Article III standing. *See, e.g.*, *Allen v. Wright*, 468 U.S. 737, 755 (1984) ("stigmatizing injury" supports standing for "'those persons who are personally denied equal treatment'" (quoting *Heckler v. Mathews*, 468 U.S. 728, 740 (1984)); *see also Northeast Florida Contractors v. City of Jacksonville*, 508 U.S. 656, 666 (1993) ("denial of equal treatment" is a cognizable injury under Article III).

To be sure, the stigmatic injury here is not identical to those at issue in cases of race and sex discrimination. Nonetheless, it is no small matter for politicians to receive special benefits on account of their status as Members of Congress, and, as explained above, it is not "the office of a court to insist that getting additional [benefits] is a good when the recipient, a congressman, says that in his political position it is a bad." *Boehner*, 30 F.3d at 160. Moreover, if the D.C. Circuit refused to second-guess that commonsense allegation of injury in reviewing the summary judgment in *Boehner*, this Court certainly should not do so in the context of adjudicating a motion to dismiss. *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 882-89 (1990).

In defending its rule, OPM noted that Members of Congress and covered staff retain the option of declining the FEHBP subsidy. *See* 78 Fed. Reg. at 60654. The Government does not contend that this option defeats standing, and for good reason. For one thing, because Members cannot decline the subsidy on behalf of covered staff, that they cannot eliminate the stigma of actual discrimination from their offices as a whole. For another, while Members can themselves decline the actual subsidy, they cannot decline their *eligibility* to receive it. Accordingly, they cannot avoid the political stigma of receiving special privileges based on their status as Members of Congress, even if they decline to take advantage of them. For these reasons, Congressman Boehner had standing to challenge his pay increase, even though he simply could have turned it down. The same result should follow here.

### C. The OPM Rule Forces Plaintiffs To Become Complicit In Breaking The Law

Finally, Plaintiffs have standing because the OPM Rule forces them to become complicit in an illegal scheme for dispensing large sums of government money without lawful authority. Under the OPM Rule, every time a Member of Congress hires a staff member in his or her official office, that action will trigger thousands of dollars in illegal subsidies. Because Members

obviously cannot go without any staff, the OPM Rule thus forces *them* to be personally complicit in the violation of federal law—a harm far more concrete and particularized than a bystander's "mere interest in seeing laws obeyed." Def. Br. at 11.

Moreover, as the Government acknowledges, Members are required to undertake the administrative task of determining which of their staffers qualify as "employed by the official office," thus triggering eligibility for the unlawful subsidies. That administrative burden is itself sufficient to create Article III standing. *See Frank v. United States*, 78 F.3d 815, 823 (2d Cir. 1996) (administrative burden of complying with requirement to conduct background checks inflicted a cognizable injury on sheriff), *vacated on other grounds*, 521 U.S. 1114 (1997). Moreover, the same burden also exacerbates the problem of complicity. The Government attempts three different explanations of why the categorization requirement is not a cognizable injury, but none is satisfactory.

First, the Government contends that the requirement to categorize staff does not arise from the OPM Rule, but rather from the ACA itself. Def. Br. at 15–17. That is incorrect, as Section 1312(d)(3)(D) by its terms does not require Members or staff to do anything. In any event, even if that provision did require Members to categorize their staff, it is only the OPM Rule that transforms that otherwise minor task into an objectionable act of complicity in a serious violation of federal law. The injury for which Plaintiffs seek redress is thus directly traceable to the OPM Rule, and would be redressable by a judicial decision setting it aside.

Second, the Government contends that the administrative burden of categorizing staff is not a concrete injury because compliance is optional or because Members can delegate the task to the House or Senate Administrative Office. Def. Br. at 17–18. But contrary to the Government's assertion, the regulation by its terms imposes a mandatory and non-delegable

duty: it states that a "congressional staff member" is eligible for the subsidy "if the individual is determined *by the employing office of the Member of Congress* to meet the definition of congressional staff member," and it further states that "[t]he designation *shall* be made for the duration of the year during which the staff member works for the Member of Congress." 5 C.F.R. § 890.102(c)(9)(ii) (emphases added). Moreover, even if the duty to characterize staff were delegable, the act of delegation itself would be both an administrative burden and, in this context, a directive to the delegee to facilitate the violation of federal law, which would hardly eliminate the Member's forced complicity in the violation.

Finally, the Government argues that even if Members have standing to challenge the part of the OPM Rule that imposes the duty to categorize their staff, they do not have standing to challenge the separate part of the Rule that authorizes the illegal subsidies. But as explained above, it is the OPM Rule that transforms the categorization requirement into a wrongful action, thereby inflicting palpable injury on those who must comply with it. For that reason, the injury Plaintiffs complain of is directly attributable to the OPM Rule, and the only way to redress the injury is by setting aside the Rule's unlawful subsidy.

## CONCLUSION

For the foregoing reasons, and those stated in the Plaintiffs' brief in opposition, the Court should deny the Government's motion to dismiss.

Dated: April 21, 2014   Respectfully submitted,


By: _/s/_ Gregory G. Katsas   

  Gregory G. Katsas
  ggkatsas@jonesday.com
  Anthony J. Dick
  ajdick@jonesday.com
  JONES DAY
  51 Louisiana Avenue, N.W.
  Washington, DC 20001
  (202) 879-3939

  *Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 21, 2014, a true and correct copy of the foregoing was electronically filed using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Anthony J. Dick

Anthony J. Dick
JONES DAY
*Attorney for Amici Curiae*