UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

Senator Ron Johnson and
Brooke Ericson,

                Plaintiffs,                Case No.  14-CV-00009

     v.

U.S. Office of Personnel Management, and
Katherine Archuleta, in her official capacity,
                    Defendants.

---

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

---

The lawless administrative rule challenged in this lawsuit causes Plaintiffs concrete, individualized harm that this Court can readily redress. The Office of Personnel Management's Rule ("OPM Rule") restoring congressional health care subsidies that the Affordable Care Act ("ACA") eliminated reflects a stunning disregard for the law. By conscripting Plaintiffs into its illegal scheme, the OPM Rule causes them a number of related injuries that confer Article III standing. In even its most restrictive standing decisions, the Supreme Court has maintained that there is "little question" that individuals have standing when they are the object of the unlawful government action they challenge. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62, 112 S. Ct. 2130, 2137, 119 L. Ed. 2d 351 (1992).

That is clearly the case here. Senator Johnson and Ms. Ericson are the direct objects of the OPM Rule's administrative requirements and illegal subsidies. Thus, they are not only *acceptable* plaintiffs, they are in fact the *best* plaintiffs to challenge OPM's *ultra vires* actions. Defendants do not refute this, but instead second-guess whether Plaintiffs are right to feel harmed by the "benefits" forced upon them. But the fact remains that Plaintiffs *are* harmed by

the OPM Rule, and Defendants' view would insulate unlawful executive action from review anytime the government claims to have a beneficent purpose at heart. That cannot be the law.

At the most basic level, the OPM Rule requires Plaintiffs to identify which of Senator Johnson's employees qualify for preferential treatment under the Rule, while offering no meaningful standard for accomplishing that administrative task. A wall of precedent establishes that this sort of administrative burden itself is sufficient for standing. When the government imposes a requirement on individuals, those individuals have standing to challenge the mandate; it does not matter whether someone else will perform the unlawful task if Plaintiffs will not. The harm is further magnified by the fact that the mandated administrative chores force Plaintiffs to participate in the OPM Rule's unlawful regime and to undertake the potentially divisive task of picking which employees will receive the Rule's unlawful treatment and which will not.

This is no generalized grievance: Senator Johnson is aggrieved not as a legislator, but as the head of an office with numerous employees. Both Senator Johnson and Ms. Ericson (along with other Members of Congress and their senior staffs) are uniquely burdened by this requirement. Other citizens may share Plaintiffs' legal objections to the rule, but they are not required to heed the executive's administrative demands or actually take part in its law-breaking.

Indeed, the division between Senator Johnson and his constituents gives rise to yet more cognizable harm. The ACA eliminated congressional subsidies so that Members of Congress and their staffs would experience the health care law's highs and lows just like ordinary citizens. By circumventing this statutory mandate and restoring legislators' favored status, the OPM Rule drives a wedge between Senator Johnson and his constituents and thus harms his personal reputation and electoral prospects. This sort of personal political harm has long been enough for an individual legislator to challenge unlawful government action.

2

And even if it were not, the OPM Rule denies Plaintiffs their right to equal treatment under the ACA. It not only forces upon the Plaintiffs a "favored" status they abhor, it denies them a status of solidarity and equality which, in enacting the ACA, Congress determined was crucial for each Member and his or her office to have. In analogous contexts, like race-based redistricting, differential treatment of similarly situated parties alone supports standing to challenge an unequal law. This is because, where equal treatment is a good in and of itself, it is a harm to deny it to anyone.

The fact that the rule grants Plaintiffs a supposed "benefit" does not diminish this harm. Quite clearly, Plaintiffs do *not* want this "favored" status and its attendant burdens, and in all events they assert a right to equal treatment. It is not for the courts to second-guess whether Plaintiffs should welcome this unwanted and unlawful benefit. Nor should the courts countenance Defendants' implicit message that the executive is wholly free to rewrite the law as long as it does so in ways that provide *ultra vires* benefits. This is a government of laws, not men. When Congress passes a law that complies with Article I, section 7 of the Constitution, that law actually governs. It does not merely present a suggestion that the executive is free to disregard so long as it does so in a direction that arguably favors the governed.

In short, this is not at all the sort of "legislative standing" case Defendants claim it to be. In those cases, legislators sought standing to vindicate an injury to the institution or to undo a legislative defeat. Plaintiffs brought this suit as individuals whose benefits are directly affected by the OPM Rule's administrative circumvention of the ACA's legislative command and who have been denied something that the ACA guarantees. Their claims are those of individuals personally and distinctively injured by executive misconduct, not legislative losers. After all, the ACA – the only law at issue that actually passed through the Constitution's bicameralism and

presentment process – prohibits what the OPM Rule seeks to accomplish through executive fiat. Plaintiffs seek to vindicate the law that *won* in Congress against an unwanted executive intrusion on the administration of Senator Johnson's office and their personal benefits package. They challenge the OPM Rule not because of an abstract policy disagreement, but because OPM's lawlessness is causing them distinctly personal harm that this Court can redress by invalidating the rule – which after all are the core ingredients for Article III standing. Defendants' motion to dismiss should be denied.

## BACKGROUND

In considering passage of the Patient Protection and Affordable Care Act, PL 111-148 ("ACA"), Congress knew that the new law would require millions of Americans – many of whom would lose insurance that they had and liked – to purchase insurance on newly created exchanges.[1] To build confidence in these exchanges and to ensure that Members of Congress and their staff would understand and be responsive to the experience and needs of participants in these new exchanges, Congress decided to put its Members and staff in the same boat. The new law provided that the *only* health insurance plans that the federal government could ever make available to Congress was whatever might be available on these exchanges. Under the ACA, Members of Congress and their staff can be offered only health insurance plans "created under [the ACA]" or "offered through an Exchange" established under the ACA. ACA § 1312(d)(3)(D), ultimately codified as 42 U.S.C. § 18032(d)(3)(D).

In enacting this equal treatment mandate, Congress intended to enable its Members and their staffs to send a message to and enter into a relationship with the public. It acted to tell the

---

[1] Indeed, replacing "no frills" insurance with more "comprehensive coverage in order to increase and capture the premium dollars of those persons – generally younger and healthier – who prefer the former to the latter was a major objective of the ACA. The results have been predictable – millions have lost their old coverage. See Brief of Amici Curiae Members of the United States Senate, *et al.* ("Members Brief"), 5-6 and sources cited therein.

country that we are "in this together" and to structure whatever health insurance they might receive as part of their employment to make that claim a reality. (Complaint, ¶¶ 18-19.) This message of solidarity was not empty sentiment, but intended to be reality – a status that would affect every Member. Whether a Member supports the ACA or, like Senator Johnson, opposes it, that Member and those who work for him or her would share the fate of those Americans who would enter these new exchanges.

This was not a mere political stunt. Congress made a conscious choice in favor of solidarity with constituents and eschewed traditional health care subsidies under the Federal Employee Health Benefits Program ("FEHBP") in favor of equal treatment. (Complaint, ¶¶ 18, 24-38.) A majority in Congress took this choice very seriously, as evidenced by the repeated failure of legislative efforts to restore the subsidy. (Complaint, ¶¶ 34-37.) And many members, including Senator Johnson, continue to take it very seriously. The executive branch might find it hard to believe that these legislators would not want every special benefit they are offered, but the proof that they do not is in the legislative record and the *amicus* support in favor of this lawsuit. In enacting the ACA, Congress spoke. It decided that equal treatment was a valuable status for each Member and his or her staff.

It turned out, however, that "equal treatment" sounded good in principal but would be painful in practice. And when the time came for equal treatment to become a reality, some Members expressed dissatisfaction with this aspect of law. Of course, if a majority of Congress had wanted to change the law, they could have done so. But that would have required them to tell their constituents that "equal treatment" under the ACA really means that some are more equal than others. Not surprisingly, when legislation was proposed to do precisely what the OPM Rule now attempts, it failed. (Complaint, ¶ 34-37.) So, these Members – having lost in

5

Congress – turned to the Administration to save them from their own laws. That "save" was accomplished by the executive branch by way of a rule that "interprets" the law to mean the opposite of what it says. (Complaint, ¶ 20.)

The OPM Rule purports to amend and expand the regulations relating to the FEHBP, a program that provides group health insurance for certain federal employees. It would have continued to do so for Members of Congress and their staff had it not been superseded by the ACA requirement that such employees purchase insurance through an ACA Exchange. (Complaint, ¶ 1.) The OPM Rule undoes this statutory repeal by allowing Members and their staffs – but not the three million other civilian federal employees – to join the so-called District of Columbia Small Business Health Options Program ("SHOP"). It does this even though a SHOP exchange is limited to small businesses with fewer than 100 employees. (Complaint, ¶20.) Congress, itself, has more than 11,000. (*Id*.)

Prior to executive intervention, OPM had said that the ACA did what Congress intended it to do. It placed Members and their staffs in the same position as their constituents — *i.e.*, they could not receive tax-free subsidies. But, as noted by *Amici* Members of Congress, the President decided to change the law. (Members Brief, 3.) Joining a small business exchange allows Members of Congress and their staffs to receive a pre-tax subsidy for their health coverage from the federal government in the same way they did before the ACA. This is because in a SHOP (as opposed to an individual) exchange, a small employer can make group coverage available for its employees. In other words, under the OPM Rule, Plaintiffs are no longer being treated like every other citizen who does not work for a small business and must purchase insurance on an individual exchange. Those Americans cannot receive these subsidies. (Complaint, ¶ 3.)

6

Thus, the OPM Rule circumvents Congress' determination that its Members should share the experience of the millions of Americans who must now buy their health insurance on the individual exchanges. Members are no longer on an equal footing with their constituents. Instead, they are once again provided benefits their constituents cannot obtain on the exchanges. This harms Plaintiffs in three related ways.

First, in order to effectuate its end run around Section 1312(d)(3)(D), the OPM Rule places new administrative burdens on Senator Johnson and his staff, including Ms. Ericson. (Complaint, ¶ 12.) The OPM Rule, among other things, requires Members of Congress to determine whether a particular employee qualifies as "congressional staff" under the rule. (*Id.*) It requires that they make this determination annually for each such employee, and in 2013 Senator Johnson was required to do so within a 29-day window. (*Id.*) This requirement is doubly burdensome: it is both potentially divisive (since some members of his office will receive different benefits from others) and requires complicity in an unlawful regime. These injuries, moreover, follow exclusively from the OPM Rule. (*Id.*) There is not a word in the ACA that requires Senator Johnson or his staff to do anything. Nor is there anything in the OPM Rule that supports Defendants' assertion that Senator Johnson need not assume this burden because the Senate Administrative Office will allegedly do it "for him."[2]

Even if the Senate Administrative Office would step in if Senator Johnson failed to comply with the rule's administrative duties, Senator Johnson must still choose between taking part in an unlawful regime and allowing someone else to undertake a task of great importance to

---

[2] More fundamentally, a motion to dismiss is not the vehicle by which a defendant may dispute the allegations of a complaint. *See Warth v. Seldin*, 422 U.S. 490, 501, 95 S. Ct. 2197, 2206, 45 L. Ed. 2d 343 (1975) ("For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."); *Perry v. Vill. of Arlington Heights*, 186 F.3d 826, 829 (7th Cir. 1999) ("It is certainly true that in ruling on a motion to dismiss for lack of standing, the well-pleaded allegations of the complaint must be accepted as true.").

his own staff. And no matter who makes this determination, the classification still has an adverse divisive effect on Senator Johnson's office. Finally, when a plaintiff is the direct object of government regulation alleged to be *ultra vires*, the existence of a government back-up plan to address the circumstances in which the regulated party declines to comply does not eliminate the minimal injury required for Article III standing.

Second, beyond any administrative burden, the OPM Rule also requires Plaintiffs to take part in conduct that violates federal law. Members cannot avoid this complicity by declining FEHBP benefits, because they cannot decline them for staff or avoid legal responsibility for determining who will receive them. Not only in designating staff, but in hiring or continuing to employ that staff, Plaintiffs cause – and are tied to – the provision of these unlawful subsidies and evasion of the ACA's mandate of equal treatment. By forcing this unlawful scheme upon him, the OPM Rule harms Senator Johnson's credibility and relationships with his constituents. (Complaint, ¶ 15.) It places Members of Congress and their staffs in a privileged position that drives a wedge between Senator Johnson and his constituents. (*Id.*) This is a position that Senator Johnson and Ms. Ericson do not desire and in which the ACA does not place them. (*Id.*) Indeed, it is exactly the opposite of what was intended when Congress passed Section 1312(d)(3)(D) of the ACA.

Third, no matter what his constituents may think, the OPM Rule deprives Senator Johnson and other Members of Congress of the status of solidarity and equal treatment with their constituents that the ACA created. For better or worse, Congress enacted a law placing them in the same situation as Americans who would be purchasing insurance on the exchanges. This was done so that Members and their staff would truly be in the same position as their constituents. To be deprived of this benefit of equal treatment constitutes an injury even if it does leave

8

Members and their staff *financially* better off than they otherwise might be. This denial of Congress' desired status of solidarity and equal treatment is sufficient to confer standing in and of itself.

In addition, the OPM Rule undeniably affects the health benefits that the Plaintiffs receive as part of their employment by the federal government and thus skews their decision making. (Complaint, ¶ 14.) Because the OPM Rule had to get around the express provisions of Section 1312(d)(3)(D), it rewrote the law of mathematics – as well as the ACA and the law governing the FEHBP – by declaring the federal government to be a small business and declaring health policies purchased on the D.C. SHOP Exchange to be the same as policies purchased under the FEHBP. Under the OPM Rule, to qualify for a subsidy, Senator Johnson and Ms. Ericson must purchase one of the Gold-tier plans available on the D.C. SHOP Exchange – which directly affects how they evaluate their health care choices and dissuades them from choosing what might otherwise be the most logical option. (Complaint, ¶ 3.) For example, Senator Johnson cannot purchase a policy on the Wisconsin Exchange, even though he lives in Wisconsin. Ms. Ericson cannot purchase a silver or bronze plan and still be eligible for a subsidy.

## ARGUMENT

Like any other plaintiffs in federal court, to establish standing, Senator Johnson and Ms. Ericson must have (1) suffered a distinct and palpable injury; (2) that is fairly traceable to the act of which they complain; and (3) for which the court can provide a remedy that is likely to redress the injury. *Lujan*, 504 U.S. at 560-61; *Valley Forge Christian Coll. v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S. Ct. 752, 758, 70 L. Ed. 2d 700 (1982). When, as here, a "suit is one challenging the legality of government action or inaction,"

9

the Supreme Court has explained, "standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561-62. Quite clearly, Plaintiffs are the "object" of the OPM Rule. It directly affects their administrative duties and benefits package. In fact, that is the Rule's only purpose. It directly affects their relationship with constituents and deprives them of a status that the ACA entitles them to claim. Thus, as explained below, there is "little question" that they possess the necessary standing to invoke this Court's jurisdiction.

Importantly, this is *not* a case in which Senator Johnson asserts an institutional injury to support "legislative standing" or a general grievance with the OPM rule. Senator Johnson was not a Member of Congress when the ACA was passed and he does not claim that the OPM Rule is illegal because it impairs his voting or other prerogatives as a U.S. Senator. Thus, this is not a case like *Raines v. Byrd*, 521 U.S. 811, 117 S. Ct. 2312, 138 L. Ed. 2d 849 (1997), or cases that cite and rely upon *Raines*.

Instead, it is relevant that Senator Johnson is a Member of Congress only *because that is the group that is directly affected and harmed by the OPM Rule*. Senator Johnson's injuries are personal to him as a Member and are not injuries to the legislature as a body. Thus, this case is much like *Powell v. McCormack*, 395 U.S. 486, 89 S. Ct. 1944, 23 L. Ed. 2d 491 (1969), where the Supreme Court found that there was a live case or controversy because the Congressman plaintiff had suffered an individual harm and had lost part of his salary. In fact, in *Raines* the Supreme Court distinguished *Powell* on that basis. 521 U.S. at 820-21 ("[A] Member of Congress' constitutional challenge to his exclusion from the House of Representatives (and his consequent loss of salary) presented an Article III case or controversy [in *Powell*].").

10

While *Raines* may stand for the proposition that individual Members cannot sue to redress an injury to *Congress* as an institution, *Powell* stands for the proposition that individual Members *can* sue to redress an injury to *themselves* as individuals. This is true even if the personalized injury applies to every Member. Indeed, Article III cases and controversies often arise from actions that affect an entire class of persons.

As the Supreme Court has explained, "'the gist of the question of standing' is whether petitioners have 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'" *Mass. v. EPA*, 549 U.S. 497, 517, 127 S. Ct. 1438, 1453, 167 L. Ed. 2d 248 (2007) (*quoting Baker v. Carr*, 369 U.S. 186, 204, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962)). That means it is necessary to show injury in fact to assure that courts will not "'pass upon . . . abstract, intellectual problems,' but adjudicate 'concrete, living contest[s] between adversaries.'" *FEC v. Akins*, 524 U.S. 11, 20, 118 S. Ct. 1777, 1784, 141 L. Ed. 2d 10 (1998). Plaintiffs have more than enough at stake to meet this requirement.

## I.     Plaintiffs Have Standing to Bring the Claims Set Forth in the Complaint Because the OPM Rule Places New Administrative Burdens on Them.

The OPM Rule places new burdens on the Plaintiffs not already imposed by the ACA. Those administrative burdens are caused *solely* by the OPM Rule, and they are sufficient injuries for Article III standing. (Complaint, ¶ 12.)

As adopted by Congress, the ACA provides as follows:

> (D)  MEMBER OF CONGRESS IN THE EXCHANGE
> (i) REQUIREMENT – Notwithstanding any other provision of law, after the effective date of this subtitle, the only health plans that the Federal Government may make available to Members of Congress and their congressional staff with respect to their service

as a Member of Congress or congressional staff shall be health plans that are –

> (I) created under this Act (or an amendment made by this Act); or
> (II) offered through an Exchange established under this Act (or an amendment made by this Act).

ACA § 1312(d)(3)(D). "Congressional staff" is then defined as anyone employed by the official office of a Member. *Id.* at §§ 1312(d)(3)(D)(ii)(II). Section 1312(d)(3)(D), as enacted, does not require Senator Johnson or Ms. Ericson to do anything. Prior to the OPM Rule, thousands of pages of regulations implementing the ACA had been adopted,[3] and none required Senator Johnson or Ms. Ericson to take any steps to implement this section of the ACA. No such requirements were imposed on them until OPM decided to undo Section 1312(d)(3)(D).

In an effort to minimize the impact of the ACA's equal treatment of Congressional staff (step one of the "save"), the OPM Rule provides that some Congressional staff members are not "really" employed by their Member's office. To accomplish this, it imposes on Members an obligation to do something that they never had to do before – distinguish between "official" and "other" staff. The OPM Rule defines the only staff employees who are subject to Section 1312(d)(3)(D) as:

> A congressional staff member, *if the individual is determined by the employing office of the Member of Congress to meet the definition of congressional staff* member in § 890.101 as of January 1, 2014, or in any subsequent calendar year. Designation as a congressional staff member shall be an annual designation made prior to November 2013 for the plan year effective January 1, 2014 and October of each year for subsequent years or at the time of hiring for individuals whose employment begins during the year.

---

[3]*See* Glenn Kessler, *How Many Pages of Regulations for 'Obamacare'?*, WASHINGTON POST, May 15, 2013, available at http://www.washingtonpost.com/blogs/fact-checker/post/how-many-pages-of-regulations-for-obamacare/2013/05/14/61eec914-bcf9-11e2-9b09-1638acc3942e_blog.html (last accessed 4/21/14) (counting 9,625 of "tiny type" pages "worth almost four pages with regular, double-spaced type" of final rules).

5 C.F.R. § 890.102 (emphasis added).  The OPM Rule adopts no pre-existing classification of staff members.  It does not attempt to interpret the ACA or define who is or is not employed by a Member's "official office."  In fact, it provides no guidance for making this determination.[4]

 But the sorting of staffers is critical to the Rule.  Those who are not, for whatever reason, designated as "official staff" are not subject to Section 1312(d)(3(D) and therefore obtain ordinary FEHBP benefits.  The rest of the OPM Rule effectuates the second step of the "save."  Those who are not taken out of the ACA's equal treatment mandate by designation as "unofficial" are "saved" by the artifice of allowing them into the D.C. SHOP exchange (where they are then eligible for and given the same subsidy as under the FEHBP).

There is no doubt that it is the OPM Rule that requires "the employing office of the Member of Congress" – Senator Johnson and his senior staff – to determine which of his employees meet the new definition of "Congressional Staff member."  Under the OPM Rule, Senator Johnson and his staff – including Ms. Ericson – must spend substantial time and effort every year to categorize each employee for which he is responsible and make a factual and legal determination as to whether each such employee is covered by Section 1312(d)(3)(D).  (Complaint, ¶¶ 12, 50.)  This categorization will affect these employees' individual health care choices and costs.  It is a divisive and unpleasant burden.

Being compelled to take on this administrative burden of sorting staff to effectuate the nullification of the equal treatment mandate is a sufficient harm to establish standing.  In *Liberty University, Inc. v. Lew*, 733 F.3d 72 (4th Cir. 2013) *cert. denied*, 134 S. Ct. 683 (2013), the Fourth Circuit considered Liberty University's standing to challenge the ACA's employer mandate.  The government argued that it was speculative whether Liberty University would have

---

[4] For example, Senate Majority Leader Harry Reid has exempted his entire leadership staff from having to use the exchanges.  (Complaint, ¶ 49.)

to pay any penalty under the employer mandate and therefore the university lacked standing.

The Fourth Circuit disagreed, concluding that even if Liberty University did not have to pay a

penalty under the employer mandate, the administrative burden of complying with the mandate

was sufficient harm to confer standing. According to the court:

> Even if the coverage Liberty currently provides ultimately proves sufficient, it
> may well incur additional costs because of the administrative burden of assuring
> compliance with the employer mandate, or due to an increase in the cost of care.
> *See generally Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427,
> 457–58 (D.C. Cir. 2012) (increased compliance costs constitute injury in fact
> sufficient to confer standing); *N.Y. Civil Liberties Union v. Grandeau*, 528 F.3d
> 122, 131 (2d Cir. 2008) (administrative burden constitutes injury in fact for
> standing purposes); *Frank v. United States*, 78 F.3d 815, 823–24 (2d Cir. 1996)
> (same), *vacated on other grounds*, 521 U.S. 1114, 117 S. Ct. 2501, 138 L. Ed. 2d
> 1007 (1997).

*Id.* at 90.

The district court in *Oklahoma ex rel. Pruitt v. Sebelius*, CIV-11-30-RAW, 2013 WL

4052610 (E.D. Okla. Aug. 12, 2013), came to the same conclusion. That case involved a

challenge by the State of Oklahoma to an IRS rule permitting the federal government to pay

subsidies on behalf of individuals who purchase policies through a federally run exchange as

opposed to a state run exchange under the ACA. The payment of these subsidies would, in turn,

trigger a penalty on the employer of a recipient who did not offer qualifying coverage under the

ACA. Oklahoma asserted standing both as state *qua* state and as an employer. The court

concluded that Oklahoma lacked standing as a state, but did have standing as an *employer* to

challenge the subsidies, even though it might never be subject to the penalties triggered by them.

*Id.* at *7-8. This was because, as an employer, the state would incur various "obligations,"

"actions," and "expenses" in order to comply with the ACA. Allegations of such administrative

burdens, the court concluded, are sufficient to support standing. *Id.*

The decisions in *Liberty University* and *Oklahoma ex rel. Pruitt* are consistent with other decisions in which federal courts have held that the imposition of an administrative burden to comply with a federal law or rule is sufficient to confer standing. *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 458 (D.C. Cir. 2012) (even compliance costs that do not impose a significant burden are sufficient injury to grant standing); *N.Y. Civil Liberties Union v. Grandeau*, 528 F.3d 122, 131 (2d Cir. 2008) (compliance with a requirement that the New York Civil Liberties Union report its expenses in connection with a billboard constitutes an administrative burden sufficient to confer standing); *Frank v. U.S.*, 78 F.3d 815, 823-825 (2d Cir. 1996) *cert. granted, judgment vacated*, 521 U.S. 1114, 117 S. Ct. 2501, 138 L. Ed. 2d 1007 (1997), *portion of judgment conferring standing reinstated and affirmed*, 129 F. 3d 273 (2d Cir. 1997) (local sheriff has standing to challenge provisions of law that imposed a mutual duty on State and local law enforcement to run background checks).

### A. The Administrative Burden on Plaintiffs Is a Distinct and Palpable Injury.

The Defendants do not dispute that such an administrative burden is sufficient to confer standing. Instead, they claim that no such burden exists because, if Plaintiffs do not "want" to do what the OPM Rule compels them to do, they allege that the Senate Administrative Office will do it for them. Thus any burden imposed by the rule has been assumed "voluntarily." (Def. Br. at 14-15.)

First, the contention that Senator Johnson could delegate his responsibility is unfounded. Nowhere in the actual OPM Rule does it provide for such a delegation. The Defendants cite to 78 Fed. Reg. at 60,653 (Def. Br. at 18), but that is merely a citation to "Supplementary Information" provided by OPM when it published the notice for the final rule – not the OPM Rule itself. This "Supplementary Information" is not law. *Nat'l Indus. Sand Ass'n v. Marshall*,

601 F.2d 689, 711-12 (3d Cir. 1979) ("Supplementary Information" statement is not published in the Code of Federal Regulations, and is not itself binding); *John Morrell & Co. v. Local Union 304A of United Food & Commercial Workers, AFL-CIO & CLC*, 949 F.2d 266, 269 (8th Cir. 1991) ("Supplementary Information" is simply notice and background information and has no binding effect). Under the actual rule – the only thing that can be considered binding on anyone – the legal responsibility is placed solely on the "office of the Member of Congress."

Second, even a burden that can be shifted to someone else is sufficient to establish standing. In *Frank*, *supra*, the court held that a Vermont sheriff had standing to bring a Tenth Amendment challenge to the Brady Act, which imposed a nationwide requirement for background checks for gun purchases. The government challenged standing by arguing that the Sheriff suffered no harm because the State of Vermont agreed to do the background checks in his county if he did not want to do so. The Second Circuit nevertheless found standing because the Brady Act imposed a mutual duty on State and local law enforcement to run the background checks, and at a minimum the Sheriff had the burden of entering into an agreement with the State as to who would do it in his County:

> By making Sheriff Frank responsible—even though only concurrently with others—for ensuring that some qualified agency performs the background checks in Orange County, the Act imposes administrative burdens beyond simply reaching an agreement. To decide which of the potential CLEOs will perform the tasks required by the Brady Act, plaintiff and his counterparts must as a practical matter undertake an analysis of their own internal procedures and capabilities, consider the impact of background checks on their budgets and on delivery of customary sheriff's services, and work together to determine who may best conduct the interim background checks. This imposition compels action by state and local officials in a way that is alleged to violate state sovereignty.

78 F.3d at 823-24.

As in *Frank*, Senator Johnson and his staff, including Ms. Ericson, must decide whether or not it is best to allow someone else to make the requisite determination or do it themselves. If

the former, they must make arrangements for the Senate Administrative Office (or some other

designee) to do it. That is enough to satisfy the minimal threshold for Article III standing.

But that's not all. The *Frank* court also made clear that a concurrent burden would

support standing if it is merely *possible* that the sheriff seeking to challenge the rule might be

required to assume the burden in the future:

> Additionally, the burden does not end with an initial agreement on performing the
> checks. Plaintiff is excused from the CLEO duties only for so long as the State
> Police are willing to discharge them. And that willingness, for budgetary,
> political, and logistical reasons, is always subject to change. The CLEO duties
> therefore remain a factor in the way the sheriff's office structures its operations.
> These several burdens, we believe, impact sufficiently upon Sheriff Frank to give
> him standing to maintain the present action.

> Our concurring colleague writes that the imposition of the CLEO duties on Sheriff
> Frank is sheer speculation and that the administrative burdens are insufficient to
> support standing. First, although the possibility that the state will withdraw its
> pledge to supply personnel is not certain to occur, that possibility imposes a
> present burden on the sheriff that is by no means speculative. The sheriff's office
> must plan for the contingency even if it never materializes. Moreover, the Act
> imposes another present burden on him even if the state continues to volunteer: he
> must reach an initial agreement and continue to agree with the state and other
> potential CLEOs.

*Id.* at 824.

Even were this Court free to go beyond the four corners of the complaint and consider the

Defendants' assertion that someone else will do what the OPM Rule requires Senator Johnson to

do, the fact remains that the rule places the burden on the Senator and there is no assurance that

anyone else will continue to do his job for him.

Third, allowing another to undertake a burden that the rule imposes on Senator Johnson

itself constitutes an injury for standing purposes. Each member of Senator Johnson's staff

knows about the OPM Rule. They know that some of them may be permitted to stay in the

FEHBP and some of them may have to buy through an ACA exchange. They also know that the

17

OPM Rule puts the burden on Senator Johnson to make the determination as to who goes where. They also have a reasonable expectation that Senator Johnson will do his best to handle this fairly. That means that shirking the responsibility imposed on him by the OPM Rule (as advocated by the Defendants) and "delegating" that duty to the Senate Administrative Office, even if possible, could lead to staff resentment, especially if the Office were to make a decision that a staffer considered to be wrong. Once he is given the authority to make the determination required by the Rule, Senator Johnson, like the sheriff in *Frank*, cannot really be relieved of the responsibility to do so.

Fourth, whether or not Senator Johnson follows the OPM Rule or ignores the responsibility it imposes on him, he is being forced to participate in the Defendants' illegal nullification of the ACA's equal treatment mandate. Deciding not to exercise a power that one has been given is, nevertheless, a decision to permit what someone else will decide. Even if he can delegate the work to his staff, or to the Senate Administrative Office, or to someone else, the responsibility remains his and he must "own" the consequences. The Defendants' suggestion that if Senator Johnson does not like this requirement, he should simply ignore it (Def. Br. at 18), is illustrative of the larger problem that has brought us here. The executive branch may believe that the law is something that can be ignored, but Senator Johnson does not.

Finally, as long as the OPM Rule is in effect, Senator Johnson is complicit in the illegal extension of subsidies every time he hires – or continues to employ – an "official" staffer. Since he cannot avoid having staff, he cannot avoid this burden.

## B. Plaintiffs' Administrative Burden Is Fairly Traceable to the OPM Rule.

Defendants argue that this burden cannot support standing because the burden of sorting out staff is somehow imposed by the ACA itself or, although there is one rule that imposes both

the administrative burden and the evasion of the ACA's equal treatment mandate, this single rule can somehow be parsed into two – one that requires Plaintiffs to categorize employees into the distinct classes and another that changes the insurance status of those to whom section 1312(d)(3)(D) remains applicable. (Def. Br. at 19.)

Even if Defendants were right in claiming that the ACA imposes an unstated obligation on Members' offices to designate staff, the OPM Rule changes the nature of that burden. By tying this phantom duty to a scheme to evade the ACA, it forces Plaintiffs to participate in and facilitate an unlawful scheme.

Moreover, there is no support for the Defendants' "divide and conquer" theory of standing. They cite *Davis v. FEC*, 554 U.S. 724, 128 S. Ct. 2759, 171 L. Ed. 2d 737 (2008), for the proposition that "standing is not dispensed in gross." But neither is it halved and quartered. In *Davis*, the Court found that a former Congressional candidate had standing to challenge two subsections of the federal Bipartisan Campaign Reform Act of 2002 (sec. 319 (a) and (b)). *Id.* at 733-35. Therefore, while *Davis* reiterates the proposition that standing must exist for every claim, it is inapplicable here. The Plaintiffs only have one claim – that the OPM Rule is unlawful. They seek only one remedy – invalidation of that rule. Because the Plaintiffs are harmed by the OPM Rule, nothing in *Davis* precludes standing here.

*Mueller v. Raemisch*, 740 F.3d 1128 (7th Cir. 2014), is also inapplicable. It involved multiple challenges to different provisions of Wisconsin's statutory sex offender registration and monitoring scheme. The Seventh Circuit merely limited Mueller's standing to challenge those provisions for which he had a reasonable fear of prosecution. *Id.* at 1131-33. *Mueller* has nothing to do with this case; there is no question that the OPM Rule applies to Plaintiffs.

Defendants have not cited any case in which a court has held that a plaintiff who challenges a single statute or rule, relying on an administrative burden imposed by that statute or rule, has standing to seek invalidation of only the administrative burden and not the remainder of the rule. Ensuring that a plaintiff has a sufficient stake in the matter to present an actual case or controversy does not require slicing the loaf so thinly.

*Oklahoma ex rel. Pruitt v. Sebelius*, *supra*, is again instructive. As noted above, Oklahoma was found to have standing as an employer to challenge an IRS Rule based on various "obligations" "actions" and "expenses" that it would incur under the ACA (a statute completely separate from the IRS Rule). Although these burdens – and only these burdens – formed the basis for standing, Oklahoma was permitted to challenge the rule and not just sections of the statute imposing the burdens.

Similarly, in *Liberty University*, *supra*, the Fourth Circuit held that Liberty University had standing to challenge the ACA's "employer mandate" – the requirement that employers provide qualifying coverage or pay a penalty. Liberty could not argue that it would be harmed by the mandate itself, because it was not clear whether the coverage it would provide would constitute qualifying coverage. Nevertheless, administrative burdens imposed in connection with the mandate conferred standing to challenge the mandate itself and not simply the provisions imposing the burden. Rather, the plaintiff challenged – and the Fourth Circuit decided – the legality of the employer mandate as a whole.

This makes sense. The purpose of standing is to ensure that a plaintiff has enough at stake to create an actual case or controversy. *See Lujan*, 504 U.S. at 561-62. Imposing a compliance burden on a litigant does that. Imposing it as part of the rule that is being challenged ensures that the relief sought—invalidation of the rule—will redress the alleged injury. *Id.*

### C.    Invalidation Will Redress the Plaintiffs' Administrative Burden Injury.

Finally, the Defendants' attempt to parse the OPM Rule into individual parts is not practical and would not be proper in assessing Plaintiffs' claim for relief.  The section of the rule that imposes the obligation on the Plaintiffs to categorize employees (the language added to 5 C.F.R. § 890.102) is integral to the rest of the rule.  The employees who are to purchase insurance through the D.C. SHOP Exchange (despite the fact that the U.S. Government is not a small business) are the ones designated by the Member of Congress under 5 C.F.R. § 890.102.  The employees who will receive the subsidy just as if they were obtaining coverage under the FEHBP are the ones designated by the Member of Congress under 5 C.F.R. § 890.102.  The part of the rule imposing the burden on the Plaintiffs is the trigger for the rest of the rule.  The provisions of the rule go hand in hand and cannot be separated.

This has two consequences.  First, if this Court invalidates the OPM Rule's evasion of the ACA's conferral of equal treatment on Members and their staffs, it will alleviate certain aspects of the burden imposed on the Plaintiffs.  They will no longer be complicit in an illegal scheme.

In addition, the OPM Rule is unitary, and Plaintiffs ask this Court to strike the entire thing.  No administrative burden was imposed on Members until OPM decided to alter the effect of Section 1312(d)(3)(D).  There is no reason to assume that the burden would have been imposed in the absence of that attempt and no basis to sever the authorization of purchases on the SHOP exchange from the administrative burden imposed in order to implement that authorization. Invalidation of the rule will redress Plaintiffs' injury. *See Petrella v. Brownback*, 697 F.3d 1285, 1294-95 (10th Cir. 2012) ("[A]t this early stage of the proceeding, the court should not assume it will be unable to fashion relief that could remedy any constitutional violation found.").

After invalidation of the OPM rule, there will be no legal obligation imposed upon the Plaintiffs. Their administrative burden injury will be redressed.

**II.**   **Plaintiffs Have Standing to Bring the Claims Set Forth in the Complaint Because the OPM Rule Forces Them to Partake in an Unlawful Scheme and thus Harms Senator Johnson's Credibility and Relationship with His Constituents.**

Even if Plaintiffs were required to do nothing to implement the OPM Rule, the rule would still force them to be complicit in illegal conduct. Defendants misrepresent the way in which this confers standing, spinning Plaintiffs' allegations into a "generalized grievance" about the legality of government action. (Def. Br. at 10-11.) But the problem is not simply that the OPM Rule is unlawful, but that its illegality confers particular and personal harm on Senator Johnson in his capacity as an elected official.

The OPM Rule requires Plaintiffs to participate in the OPM's *ultra vires* scheme. (Complaint, ¶ 13.) Individuals must have standing to challenge government compulsion to participate in law-breaking. The Supreme Court has held that individuals suffer a cognizable injury when government action forces them to choose between partaking in an unlawful regime, or disobeying the law. *See, e.g.*, *Craig v. Boren*, 429 U.S. 190, 194, 97 S. Ct. 451, 455, 50 L. Ed. 2d 397 (1976) (standing where the choice was to "heed the statutory discrimination . . . or disobey the statutory command").

It also forces an unwanted benefits package upon the Plaintiffs and, by thrusting a favored status upon Senator Johnson, the OPM Rule drives a wedge between him and his constituents that causes him cognizable reputational and electoral injury. Thus, it does not matter whether the OPM Rule's evasion of the ACA's equal treatment provisions can be characterized as a "benefit." Whether or not someone else would so regard the OPM Rule, the Plaintiffs do not. Congress, in choosing a different set of rules and the opposite status for its

Members, did not. To the contrary, it determined that the ACA's original conferral of a status of solidarity and equal treatment was of value to Members as something that would enhance their relationship and political standing with their constituents.

Cognizable injury can be nonfinancial. *See, e.g.*, *Valley Forge*, 454 U.S. at 486 ("[S]tanding may be predicated on noneconomic injury."); *Clarkson v. Town of Florence*, 198 F. Supp. 2d 997, 1003 (E.D. Wis. 2002) (same). As elected officials and persons in a position of public trust, being able to insist on that status and treatment for themselves and the people who work for them is the benefit. Obtaining "more" for themselves and staff than they are entitled to and being denied a status and relationship with the public to which they are entitled is harm.

For purposes of assessing Plaintiffs' standing – in determining whether they have a sufficient stake in the outcome to make a case or controversy – what matters is how they experience evasion of the ACA. It is that experience which will determine whether there is the "personal stake" and "concrete adverseness" necessary for an actual case or controversy. *Mass. v. EPA*, 549 U.S. at 517. What matters is that they are being denied something that the ACA gives them and which another branch of government has unlawfully taken away. Being forced to cooperate in unlawful conduct will certainly make a Senator unpopular with his constituents. (Complaint, ¶ 15.) This is particularly so since the alleged illegal conduct results in Members of Congress and their staffs being treated differently than every other citizen who must purchase individual insurance on an ACA exchange. (*Id*.) The OPM Rule thus places Members of Congress and their staff in a privileged position, which drives a wedge between Senator Johnson and his constituents and is exactly the opposite of what was intended when Congress passed Section 1312(d)(3)(D) of the ACA. (*Id.*) It is a position that Senator Johnson does not desire and in which the ACA does not place him. (*Id.*) It is the OPM Rule that causes this harm. (*Id*.)

This injury is cognizable; it confers standing. In *Boehner v. Anderson*, 30 F.3d 156 (D.C. Cir. 1994), the D.C. Circuit considered whether Congressman Boehner (now Speaker Boehner) had standing to challenge a cost of living adjustment that actually increased his compensation. While the defendants argued that receiving more money could not be an "injury," Congressman Boehner argued that, in his capacity as an individual elected official, receiving an unconstitutional salary increase would harm him. The D.C. Circuit agreed:

> The Secretary of the Senate (alone) argues further that an increase in pay is not an injury. Mr. Boehner, however, says that in the context of his constituency it is. *We do not think it the office of a court to insist that getting additional monetary compensation is a good when the recipient, a congressman, says that in his political position it is a bad.*

*Id.* at 160 (emphasis added).[5]

Like Congressman Boehner, Senator Johnson believes and has alleged that being eligible for an unlawful subsidy harms him with his constituency. He has alleged that, "in his political position," the availability of a subsidy that his constituents cannot receive "is a bad." It is not the office of the court to say otherwise. This is certainly true at the motion to dismiss stage. While Defendants deny Senator Johnson's allegation of political injury, those allegations must be accepted as true. *Warth v. Seldin*, *supra*, 422 U.S. at 501; *Perry*, *supra*, 186 F.3d at 829.

In *Meese v. Keene*, 481 U.S. 465, 107 S. Ct. 1862, 95 L. Ed. 2d 415 (1987), the Supreme Court found that a member of the California State Senate had standing to challenge a law that required him to label several films that he wanted to show in public as "political propaganda."

---

[5] In *Shaffer v. Clinton*, 240 F.3d 878 (10th Cir. 2001), the Tenth Circuit declined to follow *Boehner* and denied standing to a different Congressman to challenge a congressional cost of living increase. The court reasoned that "more money" could never be harm. *Id.* at 884-885. But the weight of authority proves that this is simply not true. *See, e.g.*, *Valley Forge*, *supra*, 454 U.S. at 486; *Clarkson*, *supra*, 198 F. Supp. 2d at 1003. The court did not address the arguments to the contrary. Although the *Shaffer* court cited *Raines*, it did not explain why *Raines* controls. As noted above, it certainly does not apply here. In any event, the case for standing is stronger here than it was in *Shaffer* and *Boehner* because, in this case, Senator Johnson is not trying to undo an act of Congress but instead to *enforce* it.

The plaintiff argued that showing the films with that label would negatively affect "his personal, political and professional reputation and his ability to be re-elected." *Id.* at 473. The Court agreed and found that such harm was sufficient to support standing. *Id*. at 473-75. Just as having to label certain films as "political propaganda" would negatively affect the political credibility – his reputation and ability to be reelected – of the plaintiff in *Meese*, so does the position in which the OPM Rule places Senator Johnson. That this will harm his relationships with his constituents distinguishes this interest from the interest of all citizens that the laws be faithfully executed.

The Defendants cite *People Who Care v. Rockford Board of Education*, 171 F.3d 1083 (7th Cir. 1999), for the proposition that "public officials cannot establish injury based on possible public reaction to Government policies." (Def. Br. at 13.) But that is not what Senator Johnson alleges. He claims to be harmed by public reaction to an unlawful evasion of "Government polices" – *i.e.*, the law – that directly affect him and in which he cannot help but participate. In *People*, the Seventh Circuit held that individual school board members lacked standing to challenge a *court order* requiring the school board to take certain official action. The court held that the order applied to the School Board, not to its individual members. In other words, the injury – if any – was to the institution. In this case, Senator Johnson alleges harm to himself, not harm to Congress or to the Senate. He is not, as in *People*, asserting individual injury from a legal requirement imposed upon an institution with which he is associated. Rather, he is claiming injury from an unlawful burden imposed directly upon him as an individual member of that institution.

That this injury is to Senator Johnson's political standing and prospects as well as his reputation does not defeat standing. As *Meese* and *Boehner* make clear, political harm is a

25

distinct and palpable injury. It is well established, moreover, that "[a]s a matter of law, reputational harm is a cognizable injury in fact." *NCAA v. Governor of New Jersey*, 730 F.3d 208, 220 (3d Cir. 2013). The Senator cannot avoid this harm by declining FEHBP subsidies for himself, because he cannot decline them for his staff or avoid his responsibility to facilitate their administration.

## III.   The OPM Rule Harms Plaintiffs by Denying Them the Equal Treatment Mandated by the ACA and thus Skewing Their Healthcare Choices.

Even if the OPM Rule would not place Senator Johnson in a bad light with his constituents – even if they would not care that he and his staff are "more equal" than they are – it deprives Plaintiffs of a nonfinancial benefit. The ACA mandated solidarity and equal treatment for all members of Congress. As noted earlier, in passing the ACA, Congress wanted each Member and his or her staff to stand in a certain relationship with his or her constituents with respect to the new law and the new exchanges it would create. It wanted each Member to be able to say that they are – and to really be – in the same situation as those who would purchase insurance on the exchange. Plaintiffs are entitled to enjoy that equal treatment under the law.

To say that Senator Johnson, as a member of the class on which this benefit was conferred, is not injured by its deprivation is to say that there was no good reason to enact it in the first place. It is to ask the judiciary to dismiss Congress' intentional choice to be treated equally as a worthless act of political masochism that no Member of Congress could take seriously or really "want," and thus substitute the judgment of a court for the judgment of Congress. In enacting section 1312(d)(3)(D), Congress decided that it was important for Members to stand in solidarity with their constituents.

Being deprived of that status is an injury that is cognizable; it confers standing. In *Forum for Academic and Institutional Rights, Inc. v Rumsfeld*, 291 F. Supp. 2d 269 (D.N.J. 2003), *aff'd*,

390 F.3d 219 (3d Cir. 2004), *rev'd on other grounds*, 547 U.S. 47 (2006), a group of law schools

(with the acronym "FAIR") challenged the Solomon Amendment, which required schools that

received federal funding to give the same campus access to military recruiters as to other on-

campus recruiters. FAIR's alleged basis for standing was that the Solomon Amendment required

the law schools to eliminate existing policies that applied to non-discrimination against gays.

FAIR contended that such policies were in place because they were necessary to accommodate

the views of faculty and students on the issue. In essence, FAIR contended that to attract and

keep the best faculty and students, law schools desired to have a policy that prohibited on-

campus recruiting activities by the military, and the Solomon Amendment caused them harm

because they could not enforce such policies. The district court agreed that this was a sufficient

basis for standing, 291 F. Supp. 2d at 286, and the Third Circuit affirmed, 390 F.3d 219. The

U.S. Supreme Court ultimately reversed on the merits, but the standing decision was not

appealed by the government. 547 U.S. 47 (2006).

Senator Johnson has alleged that he wants to stand in a certain relationship with his

constituents to keep their good will (just as the law schools wanted to keep the good will of

faculty and students), but also to convey a certain message to them that would build confidence

in the Exchanges and let citizens know that Members and staff would "feel" – and be responsive

to – whatever travails that these exchanges might bring. Like the members of FAIR, the Senator

wanted his office to follow a certain policy – that Members of Congress and their staffs be

treated the same under the ACA as all other citizens.

The ACA gives the Senator and every other Member the legal right to stand in that

relationship and convey that message. It gives him the right of equal treatment. And the courts

have long held that unequal treatment, on its own, is sufficient to confer standing. In the voting

rights context, for instance, *any* resident of a racially gerrymandered district has standing to challenge the district's lines. *See, e.g.*, *U.S. v. Hays*, 515 U.S. 737, 744-45 (1995) ("Where a plaintiff resides in a racially gerrymandered district, however, the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action."). This rule is premised both on the fact that unequal "benefits" can often cause quite serious harm – as the OPM rule does here – and on the bedrock legal principle that equality itself can be a good to which all are entitled. So it is here.

The OPM Rule takes that right away. Just as the law schools were harmed by a federal law that prevented them from having a policy that was desired by their constituents and residents of raced-based districts are denied equal treatment, so Senator Johnson and Ms. Ericson are harmed in this case. Defendants may think that Plaintiffs can avoid the harm by simply not accepting the federal benefits under the OPM Rule, but that argument no more defeats standing in this case than the government arguing that the law schools could have kept their existing anti-discrimination policies in place and lose their federal funding as a result. And at bottom it simply refuses to accept the obvious harm that follows from unequal treatment. In both situations, federal law has harmed a party by putting it in a position where to receive federal benefits it must suffer a loss of credibility with its constituents. In both cases, that harm is sufficient to confer standing.

Even were that not so, Senator Johnson cannot decline this benefit for Members of his staff. In enacting the ACA, Congress decided that their status matters as well, and it is not for the courts to say otherwise. In short, Senator Johnson is being denied a set of rules and a status – of solidarity and equal treatment for his entire office – that he is entitled to have under the ACA.

The denial of this desired status is sufficient for standing in and of itself. Additionally, in

forcing this unwanted scheme upon them, the OPM Rule necessarily skews Plaintiffs' own health care choices. As a Member of Congress, Senator Johnson is included in Section 1312(d)(3)(D) and, as a result, the OPM Rule directly affects his health insurance benefits. Ms. Ericson has been designated as "Congressional Staff" and, as a result, her benefits are likewise directly affected by the OPM Rule. (Complaint, ¶ 10.) Based on Section 1312(d)(3)(D) of the ACA, Senator Johnson and Ms. Ericson are no longer eligible for coverage under the FEHBP and instead must obtain any health insurance coverage available to them as federal employees under an ACA Exchange. The OPM Rule dictates the rules for Senator Johnson and Ms. Ericson obtaining such coverage.[6]

To receive the same benefits as other similarly-situated federal employees, Senator Johnson and Ms. Ericson must purchase coverage on the D.C. SHOP Exchange. They cannot purchase their coverage on an individual ACA exchange or a SHOP Exchange other than the one in D.C. Under the OPM Rule, even though Senator Johnson lives in Wisconsin, he cannot purchase the eligible coverage on the Wisconsin exchange. Further, to obtain a pre-tax subsidy they must purchase one of the Gold-tier plans on the D.C. Exchange. (Complaint, ¶ 3.) No matter their personal preferences or the most efficient plan for their needs, Plaintiffs are not given the choice to purchase subsidized platinum, silver, or bronze plans.

While Senator Johnson and Ms. Ericson could choose to forego the health insurance "benefits" granted under the OPM Rule, there is no dispute that the OPM Rule directly affects the benefits available to them and thus distorts the decisions available to them, which is

---

[6] The Defendants contend in their brief that the plaintiffs do not maintain that the OPM Rule has any adverse effect on their own health benefits (Def. Br. at 1 and 7), but that is not the case. Paragraph 14 of the Complaint states that: "The OPM Rule not only places a substantial administrative burden on Senator Johnson and his staff, and requires them to be complicit in conduct that violates federal law; *it also harms them because it directly affects the benefits which are available to them as part of their compensation*. In addition, *the OPM Rule directly affects plaintiffs' decisionmaking regarding health insurance coverage because the OPM subsidy applies only to certain designated plans offered through the DC SHOP Exchange*." (Emphasis added.)

sufficient to give them standing. In *Boehner v. Anderson*, *supra*, a Member of Congress had standing to challenge a cost of living adjustment that increased his pay because he "clearly has standing to challenge the operation of a law that directly determines his rate of pay." 30 F.3d at 160; *see also Powell*, *supra*, 395 U.S. 486 (Congressman had standing, among other reasons, because he lost part of his salary). And Defendants cannot at this stage dispute whether the impact of the OPM Rule's distorting effect on the Plaintiffs' decision-making is good or bad. The choice is unwanted and thus harms the Plaintiffs. That too is sufficient to establish standing.

## CONCLUSION

For the reasons set forth above, Plaintiffs have standing to bring the claim set forth in the Complaint. The Defendants' motion to dismiss should be denied.

Respectfully submitted,
WISCONSIN INSTITUTE FOR LAW & LIBERTY,
Attorneys for Plaintiffs

Dated: 4/21/2014          /S/ RICHARD M. ESENBERG
                          Richard M. Esenberg, WI Bar No. 1005622
                          414-727-6367; rick@will-law.org

                          MAILING ADDRESS:
                          1139 East Knapp Street
                          Milwaukee, WI 53202-2828
                          414-727-9455
                          FAX: 414-727-6385