UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SENATOR RON JOHNSON and
BROOKE ERICSON,

        Plaintiffs,

    v.                                          Case No. 14-C-009

U.S. OFFICE OF PERSONNEL
MANAGEMENT, *et al.*,

        Defendants.

## DECISION AND ORDER GRANTING MOTION TO DISMISS

On January 6, 2014, Plaintiffs Senator Ron Johnson and Brooke Ericson, his legislative counsel, filed this lawsuit against the United States Office of Personnel Management (OPM) and its Director Katherine Archuleta. Plaintiffs seek to enjoin Defendants from enforcing and implementing a regulation promulgated by OPM related to the Patient Protection and Affordable Care Act (ACA), 124 Stat. 119, on the grounds that it is inconsistent with the ACA and that OPM acted contrary to and in excess of its authority in promulgating it. Plaintiffs also allege that the regulation violates the Equal Protection Clause of the United States Constitution. More specifically, Plaintiffs allege that OPM's regulation makes members of Congress and their staffs eligible for employer-subsidized health insurance through either a designated small business exchange or the Federal Employees Health Benefits Program (FEHBP) in direct contradiction of a provision of the ACA that requires that members of Congress and their staffs purchase their insurance on the individual exchanges set up under the ACA.

The matter is currently before the Court on Defendants' motion to dismiss for lack of subject matter jurisdiction. After carefully considering the arguments of Plaintiffs and Defendants, as well as those presented in two briefs by multiple *amici curiae*, I conclude that Plaintiffs lack standing under Article III of the United States Constitution. Therefore, the motion to dismiss will be granted.

## BACKGROUND

This lawsuit is about whether OPM and its Director had the authority to promulgate a certain regulation—5 C.F.R. § 890.102(c)(9)—related to the ACA, and whether the regulation properly construed the portion of the ACA it purported to interpret. The regulation in question interpreted an ACA provision regarding the health insurance available to members of Congress and congressional staff. The statute reads as follows:

> Notwithstanding any other provision of law, after the effective date of this subchapter, the only health plans that the Federal Government may make available to Members of Congress and congressional staff with respect to their service as a Member of Congress or congressional staff shall be health plans that are—
>
> (I) created under this Act (or an amendment made by this Act); or
>
> (II) offered through an Exchange established under this Act (or an amendment made by this Act).

42 U.S.C. § 18032(d)(3)(D)(i).

In short, the statute says that members of Congress and their staff may only receive health plans created under the ACA or offered through an exchange established under the ACA. In this lawsuit, the Plaintiffs allege that OPM, in issuing a regulation under this statute, created a loophole that allowed congressional staff an exemption from the ACA's provisions.

2

The statute defines the term "Member of Congress" to mean "any member of the House of Representatives or the Senate." 42 U.S.C. § 18032(d)(3)(D)(ii)(I). It defines "congressional staff" to mean "all full-time and part-time employees employed by the official office of a Member of Congress, whether in Washington, DC or outside of Washington, DC." 42 U.S.C. § 18032(d)(3)(D)(ii)(II). As alleged in the complaint, the legislative history demonstrates that Congress considered and rejected other statutory language that would have left members of Congress and their employees eligible for the FEHBP or permitted them to use the government contribution to purchase health insurance off an ACA-created exchange. (Compl. ¶¶ 27–37, ECF No. 1.) Plaintiffs contend that the subsection "was passed so Members of Congress and their staffs would be subject to the ACA in the same way as Members' constituents" and preclude them from receiving government contributions. (*Id.* ¶¶ 2, 38.) The apparent intent of the provision was to create a stronger incentive for members of Congress and those who advise them to make sure that the health care reform bill Congress enacted would truly benefit those who would be subject to it. According to Plaintiffs, however, the intent of this sub-section was thwarted by a "save" created by OPM's interpretation of the statutory language. (*Id.* ¶¶ 19–20.)

OPM is responsible for administering the FEHBP. 5 U.S.C. §§ 8901–8914. The FEHBP provides group health insurance for federal employees and, until the enactment of the ACA, for members of congressional staff and congressional employees. In administering the FEHBP, OPM contracts with carriers to offer health insurance to federal employees, calculates the amount of the insurance premium paid by the government for each employee, and pays these amounts to the carriers. These payments are made through the Employees Health Benefits Fund. Generally, the government pays seventy-five percent of the premiums up to a maximum dollar amount. These contributions are tax free, like other employer-sponsored group health insurance.

3

Following a notice and comment period, OPM published a final rule interpreting § 18032(d)(3)(D) that included a "substantial" revision of the proposed rule. (Compl. ¶¶ 39–46, ECF No. 1.) The regulation adopts the statutory definitions and provides guidance on designating which congressional staff members are employed by the "official office of a Member of Congress" subject to § 18032(d)(3)(D):

> The following employees are not eligible to purchase a health benefit plan for which OPM contracts or which OPM approves under this paragraph ©, but may purchase health benefit plans, as defined in 5 U.S.C. 8901(6), that are offered by an appropriate SHOP as determined by the Director, pursuant to section 1312(d)(3)(D) of the Patient Protection and Affordable Care Act, Public Law 111–148, as amended by the Health Care and Education Reconciliation Act, Public Law 111–152 (the Affordable Care Act or the Act):
>
> (i) A Member of Congress.
>
> (ii) A congressional staff member, if the individual is determined by the employing office of the Member of Congress to meet the definition of congressional staff member in § 890.101 as of January 1, 2014, or in any subsequent calendar year. Designation as a congressional staff member shall be an annual designation made prior to November 2013 for the plan year effective January 1, 2014 and October of each year for subsequent years or at the time of hiring for individuals whose employment begins during the year. The designation shall be made for the duration of the year during which the staff member works for the Member of Congress beginning with the January 1st following the designation and continuing to December 31st of that year.

5 C.F.R. § 890.102(c)(9). The Director of OPM, consistent with the regulation, later determined the "appropriate SHOP" for members of Congress and congressional staff who were not eligible under the FEHBP to be the Small Business Health Options Program (SHOP) Exchange in Washington, DC. (Compl. ¶¶ 3, 14, ECF No. 1.) Further, OPM determined that the government will continue to pay its share as calculated under the FEHBP if the member of Congress or congressional staff member purchased a "Gold-tier" plan from the D.C. SHOP Exchange. (*Id.* ¶¶ 3, 40, 44.) Although the Congress is not a "small business," the Centers for Medicare and Medicaid

4

Services authored a memorandum "stating that the federal government is 'eligible to participate in a SHOP regardless of the size and offering requirements set forth in the definition of 'qualified employer' in the Exchange final rule. . .'" (Compl. ¶ 43, ECF No. 1.)

Plaintiffs contend that § 890.102(c)(9) is unlawful in several respects. First, it allows OPM to make pre-tax employer contributions to plans that are not approved under the FEHBP. Second, it contradicts § 18032(d)(3)(D), which requires members of Congress and congressional staff to obtain health insurance plans that are created under the ACA or offered through an exchange under the ACA. Third, the regulation permits congressional staff employed by the federal government, which is not a small business as defined by the ACA, to purchase from an exchange restricted to employees of small businesses. Fourth, the regulation "violates the Equal Protection Clause of the United States Constitution in that it treats Members of Congress and their staffs different than other similarly-situated employees who obtain insurance coverage pursuant to the terms of the ACA." (*Id.* ¶ 5.)

In response to Plaintiffs' complaint, Defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), arguing that this court lacks subject matter jurisdiction. Defendants contend that Plaintiffs lack standing to bring this lawsuit, as required by Article III of the United States Constitution. Defendants contend that Plaintiffs have not suffered a cognizable injury, that any injury they may have suffered is not caused by § 890.102(c)(9), and that, in any event, the Court could not afford relief for any injury.

## LEGAL STANDARD

Federal courts do not have jurisdiction to decide every legal question that may arise. Instead, federal courts may resolve questions only when they are presented in justiciable "Cases"

5

or "Controversies." U.S. CONST. art. III, § 2, cl. 1. "As used in the Constitution, those words do not include every sort of dispute, but only those 'historically viewed as capable of resolution through the judicial process.'" *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2659 (2013) (quoting *Flast v. Cohen*, 392 U.S. 83, 95 (1968)).

An "essential aspect" of the Article III case or controversy restriction is the doctrine of standing. *Id.* at 2661. Three elements comprise the "irreducible constitutional minimums" for standing in federal court:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations and footnote omitted).

These requirements are essential not only to protect the courts from being overrun with disputes but to preserve the democratic form of our government. Under our constitutional design, in the absence of a concrete injury to a party that can be redressed by the courts, disputes between the executive and legislative branches over the exercise of their respective powers are to be resolved through the political process, not by decisions issued by federal judges. Federal judges are appointed, rather than elected, and they enjoy tenure for life. These perquisites are meant to ensure the independence of the judiciary, but the unavoidable and concomitant side-effect is that judicial decisions are not accountable to, and are largely insulated from, the democratic process, especially when predicated on a court's reading of the Constitution. Accordingly, the Constitution wisely cabins judicial authority by forbidding judges from deciding disputes unless the plaintiff is actually

injured in some concrete, discernable way. This limitation ensures "the proper—and properly limited—role of the [federal] courts in a democratic society." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "It ensures that we act as judges, and do not engage in policymaking properly left to elected representatives." *Hollingsworth*, 133 S. Ct. at 2659; *see also Diamond v. Charles*, 476 U.S. 54, 62 (1986) ("The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements."). With these considerations in mind, I will address Plaintiffs' standing.

## ANALYSIS

Plaintiffs suggest that they have suffered three distinct injuries that are fairly traceable to the actions of Defendants, any one of which would be sufficient to confer standing. First, the regulation imposes an administrative burden on Senator Johnson and his staff, forcing them to determine which members of his staff are "congressional staff" within the meaning of the regulation and the ACA on a yearly basis. Second, the rule requires Plaintiffs to be complicit in conduct that violates federal law, which harms Senator Johnson's credibility and relationships with his constituents. Third, the rule deprives Senator Johnson of the status of solidarity and equal treatment with his constituents that the ACA created. I will examine each alleged injury in turn.

**A. Administrative Burden**

Plaintiffs first argue that the regulation imposes new administrative burdens on them. Specifically, the OPM rule requires Senator Johnson and Ms. Ericson, his legislative counsel, to determine which members of Senator Johnson's staff are "official office" staff under § 18032(d)(3)(D). This necessitates the making of "a legal and factual determination as to which federal government employees on his staff are covered . . . by the ACA and which are not."

7

(Compl. ¶ 12, ECF No.1.) Further, Senator Johnson must make "this determination annually for each such employee, and in 2013 he was required to do so within a 29-day window of time." (*Id.*) The determination also requires "substantial time and effort to categorize each employee for which [Senator Johnson] is responsible . . ." (*Id.* ¶ 50.) According to Plaintiffs, this administrative burden is doubly onerous because it is potentially divisive and requires complicity in an unlawful regime.

Applying the above-cited principles of standing to the present case, I conclude that any injury traceable to the contested regulation is too speculative and undeveloped to constitute a redressable injury. It is true that the imposition of an administrative burden can, in some cases, cause enough "injury" to confer standing. For example, in *New York Civil Liberties Union v. Grandeau*, the plaintiff alleged that the defendants violated the First Amendment by insisting that it file reports about lobbying advocacy. 528 F.3d 122, 127 (2d Cir. 2008). The court concluded that a demand to comply with certain expense reporting requirements was enough of an injury to create a case or controversy, both for ripeness and standing purposes. *Id.* at 131. And in *Liberty University v. Lew,* the plaintiff was found to have standing due to its allegation that it would "incur additional costs because of the administrative burden of assuring compliance with the employer mandate, or due to an increase in the cost of care." 733 F.3d 72, 90 (4th Cir. 2013).

It is not difficult to envision how a regulation requiring someone to file multiple and lengthy reports or to spend money on administrative costs could give rise to an injury. But Plaintiffs do not cite any cases describing an injury where the administrative burden consisted of an essentially ministerial act like classifying employees as either staff members or non-staff. Plaintiffs portray the process of classifying employees as though it necessarily involves a series of labor-intensive factual and legal determinations about each staff member—a *bona fide* administrative burden—but absent from their argument is any suggestion that such a process is actually followed or required.

8

Recall that the rule imposes no guidelines for making the determination of whether an employee is "congressional staff" or not; it is up to each member of Congress to make that determination, and it is also up to each member to decide *how* to make that determination. A member may simply designate *all* employees as staff members (or not), or he may even flip a coin. Because there are no rules governing the process, any "burden" a senator might experience would be purely self-imposed.

According to the complaint, all of House Speaker John Boehner's staff have been designated official staff members and thus must participate in the exchanges. (Compl. ¶ 49, ECF No. 1.) Presumably, Speaker Boehner did not sit down and made a case-by-case analysis of each staff member to determine whether the employee should be an official staff member or not. Instead, for political or policy reasons, he simply determined that *all* staff members should be treated the same and should be subject to the same laws as everyone else. Senate Majority Leader Harry Reid, on the other hand, designated *none* of his staff as members of his official congressional staff, and thus all remain eligible for health insurance under the FEHBP. (*Id.*) This appears to be common within the halls of Congress: many members make a single classification—one way or the other—for all of their employees.[1] The decision is not an administrative one so much as a political one. Thus, the administrative "burden" of classifying employees is largely illusory.

*1. Burden Due to Divisiveness in the Office*

In addition to the argument that classifying employees as "congressional staff" every year will be administratively burdensome, Plaintiffs argue that participation in the process would be distasteful. Specifically, they argue that the decision will be potentially divisive in the workplace

---

[1] Lisa Desjardins, *Congressional Staff Caught in Middle of Obamacare Dispute*, CNN (Oct. 31, 2013), http://www.cnn.com/2013/10/31/politics/congress-staff-obamacare.

9

because some employees could end up with different benefits than others. In addition, since the regulation is itself unlawful, it requires Senator Johnson to participate in an unlawful regime.

The existence of any divisiveness in the workplace is a purely speculative injury, however. First, it is perfectly normal that staff members earn different salaries, work different hours and have various job duties. Some have coveted offices and parking spots, while others work in cubicles and take public transportation. Employees are used to disparate treatment, and in fact it would be unusual if every employee had the same benefits. Thus, the fact that some employees might end up on exchanges while others receive exemptions cannot be expected to lead to any meaningful level of divisiveness. Even if it could, Plaintiffs here are the senator and the staff member allegedly tasked with *making* the challenged determinations—they are not *themselves* experiencing the divisiveness at issue. Plaintiffs have not cited any cases where standing was premised on the as-yet unexperienced ill will of parties not before the Court. Even if some employees would be upset, that does not allow the employer to piggy-back on that distress to create a form of derivative standing. The injury must be *Plaintiffs'* injury, not that of their employees.

Even if workplace divisiveness would occur, and even if it would cause injury to Plaintiffs, such a problem could be avoided entirely by doing what Speaker Boehner and others did—treating all employees the same. The regulation does not require, or even suggest, that a senator must divide his staff into the exempt and non-exempt. If the senator *does* create a split in his ranks, any divisiveness cannot be traced to the regulation itself but to the senator's own decision. In sum, the notion that the workplace will become poisoned due to a haves-and-have-nots dichotomy is largely speculative, and such a situation can be avoided in any event by simply categorizing all employees the same.

10

### *2. Participation in an Illegal Scheme*

Plaintiffs also argue that they experience injury even if there is no actual administrative burden because the very act of classifying employees forces them to participate in a scheme they view as unlawful. This argument is unpersuasive for at least two reasons. First, it puts the cart before the horse. The question of the legality of the regulation has not been determined yet; although Plaintiffs *believe* the regulation is unlawful, such a belief cannot be enough to create standing because that would open the door to any uninjured party who had a generalized grievance with a government regulation. Under such an approach, there would be no principled limit on standing because a plaintiff need only allege a belief that the challenged regulation is illegal. *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 485 (1982) ("Although respondents claim that the Constitution has been violated, they claim nothing else. They fail to identify any personal injury suffered by them as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees.") In short, one's personal belief that a regulation is unlawful is not itself an "injury" sufficient to confer standing.

Second, as the government points out, nothing in the challenged regulation requires a member of Congress to do anything at all. To recall, the regulation applies to a "congressional staff member, if the individual is determined by the employing office of the Member of Congress to meet the definition of congressional staff member in § 890.101 as of January 1, 2014, or in any subsequent calendar year." 5 C.F.R. § 890.102(c)(9). The key word is "if." That is, the regulation does not instruct or mandate that a member of Congress must make any determinations at all; it merely says that "if" an employee is determined to be a congressional staff member, that employee will be forced onto the exchanges. A member of Congress does not need to participate in the

11

scheme at all and may simply ignore the regulation entirely. If he fails to participate, his employees will not be deemed congressional staff members and will not be forced onto the insurance exchange. Alternatively, a senator may delegate the decision to the senate's administrative office, ensuring that neither the senator nor his own staff needs to participate in the determination. Either way, nothing within the regulation requires participation in any scheme—illegal or not—because it does not mandate any action whatsoever. Accordingly, Plaintiffs are not being forced to do anything illegal.

In sum, none of the phenomena cited by Plaintiffs would create the kind of administrative burden that could be expected to give rise to a redressable injury.

**B. Reputational and Electoral Injury**

Plaintiffs next contend that the OPM rule has caused an actual injury to Senator Johnson because it requires him to participate in conduct that he believes is damaging to his reputation. Because he is forced to participate by designating staff and accepting "an unwanted benefits package," "the OPM Rule drives a wedge between him and his constituents that causes him cognizable reputational and electoral injury." (Pl. Br 22, ECF No. 12.) Thus, while Defendants might suggest that the OPM Rule confers a benefit and not a harm upon Senator Johnson, he believes his constituents will view the benefit negatively.

Senator Johnson relies heavily on *Boehner v. Anderson*, 30 F.3d 156 (D.C. Cir. 1994). In *Boehner*, the D.C. Court of Appeals found that a congressman had standing to challenge provisions in the Ethics Reform Act creating a mechanism for annual cost of living adjustments for members of Congress. 30 F.3d at 160. Specifically, the congressman had standing because the law would "directly determine[] his rate of pay," even though the law would increase his pay. *Id.* The court found that it was not within "the office of a court" to disagree with the congressman's argument that

12

a pay raise was an injury "in the context of his constituency." *Id.* Like the congressman in *Boehner*, Senator Johnson asserts that although it may seem beneficial for him to receive the pre-tax employer contribution or access the plans on the D.C. SHOP Exchange, his constituents will view his participation and the participation of his staff negatively.

For several reasons, I do not find *Boehner* persuasive. First, in the 20 years since *Boehner* was decided, no court at any level has adopted its reasoning to find that a member of Congress has standing based on what the member *believes* his or her constituents might think about the benefits package the member may utilize. In fact, *Boehner* has generally been cited only as a case to be distinguished or side-stepped rather than followed. For example, in a similar lawsuit the Tenth Circuit concluded that a congressman did not have standing. *Schaffer v. Clinton*, 240 F.3d 878, 886 (10th Cir. 2001) (holding that congressman lacked standing to challenge Ethics Reform Act's cost of living adjustment under Twenty-Seventh Amendment). In reaching its conclusion, the Tenth Circuit expressly rejected the standing analysis in *Boehner*, concluding that it "relies on no Supreme Court precedent and precedes [*Raines v. Byrd*, 521 U.S. 811 (1997)]. We find the cursory discussion in *Boehner* unpersuasive and contrary to recent Supreme Court law and thus reject its standing analysis." *Id.*

Second, *Boehner* is at odds with several Supreme Court cases since 1994. In *Raines*, as the Tenth Circuit noted, the Supreme Court concluded that members of Congress do not have standing to challenge the line-item veto based on a "dilution of institutional legislative power" because the injury was not sufficiently concrete. 521 U.S. at 821, 826. Moreover, the Supreme Court has repeatedly and consistently rejected arguments suggesting that plaintiffs have standing based on speculative or attenuated chains of possibilities. *E.g.*, *Clapper v. Amnesty Intern. USA*, 133 S. Ct. 1138, 1150 (2013) ("In sum, respondents' speculative chain of possibilities does not establish that

13

injury based on potential future surveillance is certainly impending or is fairly traceable to § 1881(a)."); *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("Accepting an intention to visit the National Forests as adequate to confer standing to challenge any Government action affecting any portion of those forests would be tantamount to eliminating the requirement of concrete, particularized injury in fact.") Whatever persuasive force *Boehner* had in 1994, it is significantly eroded in light of the Supreme Court's clearly established position on speculative injuries in standing cases.

Finally, *Boehner* is arguably inconsistent with *People Who Care v. Rockford Board of Education, School District 205*, a case from this circuit. 171 F.3d 1083 (7th Cir. 1999). In *People Who Care*, three members of the Rockford School Board attempted to intervene in the case, contesting a judge's order directing the Board to approve a levy, a position that the members had opposed during their respective campaigns. *Id.* at 1088–89. The members argued that the order caused injury by "turning [them] into . . . dissembling politician[s] in the minds of [their] constituents in reversing (under court compulsion) [their] position on the tort taxes." *Id.* at 1089. In affirming the magistrate judge's conclusion that the members had not suffered a cognizable injury, the Seventh Circuit concluded that the Board had standing, but not its members as individuals. *Id.* at 1090. "[A]n order to do something in one's official capacity does not create the kind of injury that can support a suit in federal court consistent with Article III's limitation of the judicial power of the United States to cases or controversies . . ." *Id.* at 1089 (citing *Planned Parenthood of Wisconsin v. Doyle*, 162 F.3d 463, 465 (7th Cir. 1998); *Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 101 F.3d 503, 507 (7th Cir. 1996)). The members did not have standing because the order "ran in the first instance against the school board, the board members being mentioned in the order only to make sure that the board complied." *Id.* at 1090. Because the

14

members were not "being ordered to pay out of their pocket or do anything else that would infringe their liberty or property as distinct from their officials powers," they had suffered no personal injury for Article III purposes. *Id.*

For all of these reasons, *Boehner* is unpersuasive. No other cases support the notion that a member's belief about how his constituents might view him would be enough to create standing to sue. As noted in Section A.2 above, if standing to sue were conditioned on a plaintiff's own subjective views about a regulation, there would be no principled way to limit access to the courts and the judiciary would become the kind of super-legislature specifically rejected by the Founders.[2]

**C. Solidarity and Equal Protection**

Plaintiffs also assert that the OPM rule violates their interest in "solidarity and equal protection." Plaintiffs have a cognizable interest in equal protection under the law, and the OPM regulations violate that interest, they allege, because Plaintiffs are not treated the same as other "similarly situated employees."

But once again any injury traceable to the regulation has not actually materialized. Importantly, the complaint never alleges what health insurance, if any, Plaintiffs obtained; nor does it allege whether that insurance was purchased through the SHOP Exchange, the FEHBP, or some other means. And it is unclear if Ms. Ericson has herself been designated an employee of the "official office" of Senator Johnson and thus prohibited from participating in the FEHBP. Rather, the complaint alleges that Ms. Ericson "is one of the Congressional staff employees affected by the OPM rule." (Compl. ¶ 10, ECF No. 1.) Later in the complaint, Plaintiffs allege that the OPM rule

---

[2] In addition, it is difficult to envision why many constituents would view the Senator unfavorably, given that he vehemently opposes the OPM rule and has even brought a federal lawsuit to overturn it. It is equally conceivable that some voters will view him *more* favorably for attempting to insist that Congress and its staff be subject to the same laws as all citizens.

15

"also harms them because it directly affects the benefits which are available to them as part of their compensation. In addition, the OPM Rule directly affects plaintiffs' decision-making regarding health insurance coverage because the OPM subsidy applies only to certain designated plans offered through the DC SHOP Exchange." (*Id.* ¶ 14.) These vague allegations that Plaintiffs are "affected" by the OPM Rule are not sufficient to establish Article III standing. In short, Plaintiffs have not identified "any personal injury suffered by them *as a consequence* of the allegedly illegal regulation, other than the psychological consequence presumably produced by observation of conduct with which one disagrees." *Valley Forge Christian Coll.*, 454 U.S. at 485 (emphasis in original).

Even assuming that one or both Plaintiffs selected a Gold-tier plan on the DC SHOP Exchange and received the subsidy as allowed under the OPM rule, it is hard to understand how this would constitute an "injury" to either person. Aside from the already rejected reputational/electoral theory, the OPM rule inures to Plaintiffs' benefit, as the complaint openly acknowledges: the OPM rule "puts [Members of Congress and their staffs] in a better position by providing them with a continuing tax-free subsidy from the federal government," (Compl. ¶ 3, ECF No. 1), and "thus places Members of Congress and their staffs in a privileged position," (*id.* ¶ 15), because "many Members of Congress want to continue to obtain group health insurance, (or to make it available to their staffs) essentially tax free and at the government's expense." (*Id.* ¶ 20.) Given that the Plaintiffs receive, at worst, a *benefit*, they cannot claim to be injured under an equal protection theory.

**D. If These Plaintiffs Lack Standing, There Would be No Recourse**

Finally, it is necessary to address an argument advanced primarily by the *amici curiae*. In short, they argue that if these Plaintiffs do not have standing, then there will be no recourse to stop the Obama Administration from ignoring the laws Congress passes and from exceeding its authority

16

in other ways. They portray the OPM rule as just one more example of an administration that has on multiple occasions usurped the powers entrusted to Congress by rewriting or amending laws the Congress has passed or simply refusing to enforce them. If the courts—a co-equal branch of government—do not step in, *amici* argue, then there will be no check on executive authority.

First, there is nothing in the Constitution stipulating that all wrongs must have remedies, much less that the remedy must lie in federal court. In fact, given the Constitution's parsimonious grant of judicial authority, just the opposite is true. As the Supreme Court has observed, "[o]ur system of government leaves many crucial decisions to the political processes. The assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974). Forty years ago the Supreme Court addressed a similar line of argument, and its holding is worth quoting at length:

> It can be argued that if respondent is not permitted to litigate this issue, no one can do so. In a very real sense, the absence of any particular individual or class to litigate these claims gives support to the argument that the subject matter is committed to the surveillance of Congress, and ultimately to the political process. Any other conclusion would mean that the Founding Fathers intended to set up something in the nature of an Athenian democracy or a New England town meeting to oversee the conduct of the National Government by means of lawsuits in federal courts. The Constitution created a representative Government with the representatives directly responsible to their constituents at stated periods of two, four, and six years; that the Constitution does not afford a judicial remedy does not, of course, completely disable the citizen who is not satisfied with the 'ground rules' established by the Congress for reporting expenditures of the Executive Branch. Lack of standing within the narrow confines of Art. III jurisdiction does not impair the right to assert his views in the political forum or at the polls. Slow, cumbersome, and unresponsive though the traditional electoral process may be thought at times, our system provides for changing members of the political branches when dissatisfied citizens convince a sufficient number of their fellow electors that elected representatives are delinquent in performing duties committed to them.

*United States v. Richardson,* 418 U.S. 166, 179 (1974).

Second, as the above quotation also makes clear, it is not true that the courts are the only

17

remedy for the Administration's alleged unlawfulness. The Congress itself is surely not helpless to rein in the executive: it has spending authority, investigative powers, and it even wields the blunt instrument of impeachment; it has the power to pass, delay, or kill initiatives the executive branch might propose; and it may delay or thwart consideration of executive branch nominees. In fact, I may take judicial notice that the current director of the OPM, Defendant Archuleta, was herself questioned by senators about these very issues during her 2013 confirmation hearing.[3]

And of course individual members of Congress, and those running to replace them, may highlight these issues in their election campaigns and seek to convince the voting public that change is needed. Although their ability to put pressure on a second-term administration may be lessened, candidates and incumbents sharing Senator Johnson's views may nevertheless raise the issue in their own elections in an effort to increase their numbers in the Congress, which in turn would give them even more leverage over the administration. In short, multiple political avenues exist for those who would oppose the OPM's rule or the other instances of allegedly unconstitutional overreaching by the Executive branch cited by the *amici*.

The fact that the votes needed to utilize the political remedies are lacking does not alter the conclusion that, absent a concrete injury to the plaintiff, a dispute is not one for the courts to resolve. This rule applies even when the dispute is over fundamental issues of constitutional magnitude. Indeed, the allegations of the complaint here, which must be accepted as true at this stage of the proceedings, *Navarro v. Neal*, 716 F.3d 425, 429 (7th Cir. 2013), are that the executive

---

[3] Sean Reilly, *Archuleta Confirmed for OPM Chief*, FEDERAL TIMES (Oct. 30, 2013), http://www.federaltimes.com/article/20131030/AGENCY02/310300010/Archuleta-confirmed-OPM-chief. The article notes that "Archuleta's candidacy then became entangled in a fight over how OPM planned to implement a provision in the Affordable Care Act requiring members of Congress and their personal staffs to buy health insurance on market exchanges instead of through the Federal Employees Health Benefits Program."

18

branch has rewritten a key provision of the ACA so as to render it essentially meaningless in order to save members of Congress and their staffs from the consequences of a controversial law that will affect millions of citizens. If proven, this would be a violation of Article I of the Constitution, which reposes the lawmaking power in the legislative branch.

The violation alleged is not a mere technicality. It strikes at one of the most important safeguards against tyranny that the framers erected—the separation of powers. As James Madison explained in response to the objection that the proposed Constitution disproportionally distributed the powers of government:

> No political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty, than that on which the objection is founded. The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny.

THE FEDERALIST NO. 47.

Nevertheless, absent a concrete injury to the party bringing the lawsuit, there is no "case" or "controversy" over which the courts have jurisdiction. For the judiciary to intervene under these circumstances would violate the same principle Plaintiffs seek to vindicate in their own lawsuit with far less opportunity for correction by either the other branches or the people. For all of these reasons, the dispute must be left to the "Nation's elected leaders, who can be thrown out of office if the people disagree with them." *Nat'l Fed. of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2579 (2012). "It is not our job to protect the people from the consequences of their political choices." *Id.*

In sum, the fact that the allegations advanced in this action might be difficult or even impossible to pursue in federal court for any other plaintiffs does not mean that *these* Plaintiffs have suffered the kind of injury that could give rise to standing.

19

## CONCLUSION

Consistent with the Case or Controversy limitation of Article III and Supreme Court precedent, I conclude that Senator Johnson and Ms. Ericson do not have standing. Accordingly, Defendants' motion to dismiss is **GRANTED**. The clerk will enter a judgment of dismissal.

**SO ORDERED** this  21st   day of July, 2014.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court
